IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs at Knoxville February 25, 2014

**STATE OF TENNESSEE v. MELVIN POWELL**

**Appeal from the Criminal Court for Shelby County**
**No. 11-06327   W. Mark Ward, Judge**

---

**No. W2013-00844-CCA-R3-CD  - Filed April 3, 2014**

---

The Defendant, Melvin Powell, was found guilty of rape of a child, a Class A felony. *See* T.C.A. § 39-13-522 (2010) (amended 2011).  The trial court sentenced him as a Range I offender to twenty-five years at 100% service.  On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction, (2) the State failed to make a proper election of the offense, and (3) the trial court erred in admitting paternity testing results based on the laboratory's accreditation.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Stephen C. Bush, District Public Defender; Phyllis L. Aluko (on appeal), Amy G. Mayne (at trial), and Jane Sturdivant (at trial), Assistant District Public Defenders, for the appellant, Melvin Powell.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; Terre Fratesi and E. Cavett Ostner, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case relates to events involving the Defendant's daughter, who was twelve years old at the time and became pregnant.  At the trial, the victim's mother testified that she had three children with the Defendant, with whom she had lived and been romantically involved for five years but never married.  She said that after they ended their relationship, the children stayed with the Defendant every weekend.  She said she dropped off the children Friday after

school and picked them up on Sunday, although the Defendant occasionally provided the transportation. She said the Defendant lived with his mother.

The victim's mother testified that on May 25, 2011, she and the victim had a "heartbreaking" conversation. She described the victim as crying, nervous, scared, and ashamed. She said her mother was present for the conversation. As a result of the conversation, she took the victim to the hospital, where a social worker and a nurse talked to the victim. She said hospital personnel advised her that the victim was pregnant and told her not to tell the victim. She and the victim went to the Child Advocacy Center, where staff talked to them separately. She said that after they went home, she told the victim that the victim was pregnant. She said they decided the victim would have an abortion.

The victim's mother testified that they went to an abortion clinic in Memphis but that the victim was unable to tolerate the vaginal probe during a pelvic ultrasound. She said that the victim "hollered" and that the clinic was unable to complete the procedure. She said she took the victim to another clinic in Little Rock, Arkansas, where the victim was sedated for an abortion on June 4, 2011.

The victim's mother testified that shortly before school ended for the summer and before May 25, 2011, she was contacted by the victim's school counselor because the victim had stated she wanted to kill herself. She went to the school and met with the counselor and some social workers. She said she called the Defendant, who said, "[T]hat girl is going to have those white folks in our business." When asked if his comment seemed strange, she said, "That's Melvin."

The victim's mother testified that the Defendant called her between May 25 and June 4, 2011, and asked, "What's [the victim] saying?" and "What's going on with [the victim]?" She said she told him not to call them, accused him of raping their daughter, and hung up. She said that after she hung up on him, he called more than three times in one day.

The fourteen-year-old victim testified that her birthdate was October 13, 1998, and that she was in the eighth grade. She identified the Defendant as her father. She said that after her mother and father no longer lived together, she saw the Defendant on the weekends at his mother's house. She said she visited the Defendant once at her uncle, Terrell Powell's apartment. She said her grandmother was present when she visited the Defendant at her uncle's apartment. She said that when she visited at her grandmother's house, she slept in her grandmother's room or on the living room couch or floor. She said that her sister slept with her grandmother and that her brother slept with her in her grandmother's room.

When asked if she could remember the time shortly before her twelfth birthday, she said, "Not really but I will try, not really." She said her relationship with her father was "up-and-down" because "we never got to . . . see our father as we thought we would." She said he came and went when they were at their grandmother's house. She said he would stay with them for two or three hours and leave and not return until around 9:00 or 10:00 p.m. She said she would have liked to have spent more one-on-one time with him. She did not know where he went when he left, although she said he spent more time with his girlfriend than with her siblings and her. She said it made her feel like he had abandoned them. She recalled enjoying an Easter egg hunt at her grandmother's house with her father.

The victim testified that the Defendant never hit, cursed, or mistreated her. She said she was respectful of him. She said that she enjoyed spending time with her paternal grandmother, who had died since the events in question.

The victim testified that the Defendant would come to her and ask if she wanted to have sex. She said she told him she did not. She said that after her twelfth birthday, he told her he was the only one who should have sex with her, which made her feel weird. She said that at some point later, the Defendant put his hands in her shirt and kissed her neck and ear when they were in her "grandmother's first room," which she described as a room with a couch and television and where no one slept. She said the Defendant woke and sexually touched her when she was asleep in her grandmother's room. She said her grandmother never woke during the incidents.

The victim testified that her father woke her and rubbed "all over" her when she was asleep on her uncle's living room floor. She said he touched the skin of her breasts. She said she moved his hand and told him she did not want to have sex. She said that her sister was asleep on the floor during the incident and that her grandmother was present and spoke.

The victim testified that the incidents began when the Defendant said, "Come here, get closer to me," and called her by a nickname. She said he rubbed on her and pushed her closer and that she told him no and moved his hand. She said that eventually, the incidents escalated to sexual penetration.

Regarding the first incident of sexual penetration, the victim testified that she was twelve years old. She said the Defendant woke her when she was in her grandmother's bedroom. She said the Defendant took her into the room with the couch and television, took off his clothes, and began going up and down with his hands on his penis. She said he put his penis in her vagina and "starting going back and [forth]." She said intercourse was painful the first time. She said that when she said, "oh, oh," the Defendant told her to be quiet. She said the Defendant told her that he was the only person who would have sex with

-3-

her. She said she told him that she did not want to have sex, that he was her father, and that he should leave her alone.

The victim testified that she did not know how many incidents of intercourse occurred but said that once it began, it happened every time she stayed at her grandmother's house, which was weekly. She said that around her grandmother or friends, the Defendant acted like a father. She said that at night, though, he said, "[O]k, let me have sex with you. You [sic] my daughter but I love you but let me have sex with you." She said she told him that if he loved her, he would show his love instead of having sex with her and that he would act like a father and not a man who had sex with his child.

The victim testified that the Defendant sometimes smoked marijuana when he sexually penetrated her. She said that in addition to penile-vaginal penetration, the Defendant attempted or completed penile penetration of her mouth and "butt." She said he asked her to do him a favor and pulled her head toward his penis. She said that she pushed him away and told him she would not do it and that his penis did not go inside her mouth. She said that he told her to have sex with him instead, that she refused, and that he had intercourse with her anyway. She said the Defendant took her into a closet and penetrated her anally with his penis when they were at her uncle's house. She said that it was painful, that she screamed, and that she pushed him away.

The victim testified that she began menstruating at age eleven. She said that during the time the Defendant was sexually abusing her, she missed two periods. She said that before the school year ended in May 2011, a teacher saw her crying at school and took her to a counselor. She said she told the counselor that she was having a bad day, that she needed to talk to someone, and that she wanted to kill herself. She said she had been thinking about telling someone about the abuse and wanted to tell her mother but did not know how. She said that her mother came to the school but that she did not tell her mother about the abuse that day. She said she told her mother about a week before the school year ended. She said that her mother took her to a doctor and that she had a positive pregnancy test. She said she talked to Teresa Onry at the Child Advocacy Center and told her the facts about which she was testifying. She said she and her mother decided to end the pregnancy. She said that she was unable to tolerate a vaginal ultrasound at a Memphis abortion clinic and that she had an abortion under anesthesia in Little Rock.

The victim testified that she did not know the date she became pregnant. She said the Defendant wore a condom once. She said that she saw "white stuff" from the Defendant's penis on her leg but that she never felt it inside her vagina.

The victim testified that she felt awkward and scared by the abuse. She said the Defendant never threatened her physically. She said the Defendant told her that he would give her a nicer cell phone and more money than he gave her brother in exchange for her silence about the abuse. She said she did not want money in exchange for sex. She said she was scared to tell her mother because she thought the Defendant would try to find and hurt her.

The victim testified that she loved the Defendant but felt betrayed by what he did. She said she had attended counseling and no longer blamed herself.

On cross-examination, the victim testified that she and her sister slept on the living room couch, on the living room floor, or on the bed in her grandmother's room. She said that when she was at her grandmother's house the other adults present were her Uncle Terrell, Ron Brown, her uncle's girlfriend Nicole, and the Defendant's girlfriend Brittney Baskin. She said that three couches were in the living room and that if she slept in the living room, others were present. She said that she was always in her grandmother's room when the Defendant woke her at her grandmother's house. She said that she told one person at school about the abuse and that she told the person around the same time she told her mother.

On redirect examination, the victim testified that the Defendant never sexually abused her with other people watching. She said he abused her at midnight when others were asleep. She said Ms. Baskin lived at her grandmother's house. She said Ms. Baskin and the Defendant had two children together. She said her father began abusing her before Ms. Baskin's first pregnancy. She said that on one occasion when the Defendant was abusing her, Ms. Baskin tried to open the door but could not because a fork was in it to keep it locked and that she heard Ms. Baskin say, "Melvin, what you [sic] doing?" She said Ms. Baskin and the Defendant argued in another room. She was certain her pregnancy resulted from her father's actions and said she was twelve years old when she became pregnant.

Arkansas Family Planning Services Clinic Director Lori Williams testified as an expert "in her field of being a nurse practitioner." She said that on June 4, 2011, she performed an ultrasound on the victim. She said the victim's fetus was nine weeks menstrual age and seven weeks fertilization age. She said the menstrual age is two weeks older than the fertilization age because a woman normally ovulates and conceives about two weeks after the first day of her last menstrual period. She said that once fertilization occurred, subsequent acts of intercourse cannot result in another conception or implantation. She said the victim was at an increased maternal risk due to her age.

Ms. Williams testified that the victim was sedated and received an abortion. She said she collected the fetal tissue in order to provide it to the police. She said that her clinic

collected fetal tissue for crime laboratories and that she had done it about three to four times a year for many years.

Memphis Police Sergeant Bernice Black testified that she spoke with the victim. She said that in addition, the victim received a forensic interview at the Child Advocacy Center and by the Department of Children's Services. She was not in the room when the victim was interviewed at the Child Advocacy Center, but she observed the interview on a monitor. She said the victim was consistent in the interview about who raped her.

Sergeant Black testified that after the victim's Child Advocacy Center interview, she interviewed the Defendant, who voluntarily provided a DNA sample. She collected tissue from an abortion clinic in Little Rock and said it was stored at the Memphis Sexual Assault Center until it was taken to Scales Biological in Mississippi. She did not collect a DNA sample from the victim.

Dr. Bo Scales, an expert in the field of DNA forensic testing and a co-owner of Scales Laboratory, testified that his laboratory used forensic testing methods that were widely accepted in the scientific community. He said the laboratory was audited yearly and was accredited by the "Association of Criminal Laboratory Directors," which he referred to as the ASCLD.[1] Dr. Scales's laboratory had been accredited by the ASCLD for almost ten years. He said that previously, the laboratory was accredited by the American Association of Blood Banks (AABB). He said ASCLD accreditation was the gold standard in the industry and involved greater scrutiny than AABB accreditation. He said that he had been an auditor for both organizations and that he was a member of the committee that wrote the AABB's standards.

Dr. Scales testified that siblings who were not identical twins had different DNA profiles. Regarding the present case, he said he received two buccal swabs from the mother and the alleged father and a tissue sample labeled "[p]roducts of conception." Referring to a chart, he noted that the chromosomes from the fetal tissue corresponded with the chromosomes of the donors of the material on the buccal swabs. He concluded that odds of the male donor of the buccal swab material being the father of the fetal tissue were 18,256,087 to one. He said a 99.999995 percent probability existed that the male donor was the father. He said that the common genetic markers shared by the Defendant and the victim indicated incest.

---

[1] Regarding the organization for which ASCLD is an acronym, we note that at a jury-out hearing, defense counsel referred to the "American Society of Crime Lab Directors."

On cross-examination, Dr. Scales testified that he did not think he was told the Defendant had a brother. He said that given the results he received, he would not have wanted to test the Defendant's brother's DNA. He agreed he only tested the Defendant's DNA. Regarding "Dye Blobs" and "spikes" seen on the test results, he explained that they were a normal occurrence in every fifteen to twenty tests and did not affect the integrity of the results.

Dr. Scales testified that ASCLD accreditation pertained to criminal forensic investigation. He agreed that ASCLD and AABB accreditation standards were different.

On redirect examination, Dr. Scales testified that he was not asked to conduct DNA testing of the Defendant's brother. He said that seventy-five percent of the time, brothers who were not identical twins shared some DNA markers. He said, though, that all the markers would have to match for the Defendant's brother to be the father of the material he examined. Regarding whether his results were affected by the Defendant's having a brother who was not an identical twin, he said:

> With those kinds of numbers, the 18,000,000, they're not identical so what you would be asking is for him to have all the same markers that would be required to make this child. So I have to tell you twenty-five percent of the time brothers don't [sic] anything. Seventy-five percent of the time they do but they would have to share the right markers to make this child but that's all speculative because I didn't test the man.

The State elected to seek a conviction for the instance of vaginal intercourse resulting in the victim's pregnancy. The jury found the Defendant guilty of rape of a child. This appeal followed.

**I**

The Defendant contends that the evidence is insufficient to support his conviction. The State contends that the evidence is sufficient. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835

(Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

Pertinent to this appeal, "[r]ape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a) (2010) (amended 2011). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7) (2010) (amended 2013).

As we have noted, the State presented evidence of more than one instance of unlawful sexual penetration and sought a conviction for the instance which resulted in the victim's pregnancy. In the light most favorable to the State, the evidence shows that the Defendant began sexually penetrating the victim after her twelfth birthday, which was on October 13, 2010. The victim and her siblings visited the Defendant at his mother's house on the weekends, although they visited him at his brother's house once. She said that once the abuse began, it occurred weekly. The victim's mother learned of the abuse on May 25, 2011. Before that date and shortly before the victim's summer break from school, the victim's mother was called to the victim's school because the victim made suicidal statements. The victim testified that this was related to the abuse. She also said she had missed her period twice. DNA evidence established the Defendant's paternity of the fetal material collected from the victim with 99.999995 percent certainty. The evidence is sufficient to support the Defendant's conviction, and he is not entitled to relief on this basis.

## II

The Defendant contends that the State's election of the offense was plain error because the State presented evidence of numerous instances of sexual penetration but did not identify the one upon which it relied. The State contends that its election was proper. We agree with the State.

When evidence is presented of multiple offenses that would fit the allegations of the charge, the trial court must require the State to elect the particular offense for which a conviction is sought and must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. *See, e.g., State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1998); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997); *State v. Shelton*, 851 S.W.2d 134, 136 (Tenn. 1993); *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973).

> This election requirement serves several purposes. First, it ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense.

*State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000). The requirements of election and a jury unanimity instruction exist even though the defendant has not requested them. *See Burlison*, 501 S.W.2d at 804. Failure to follow the procedures is considered to be of constitutional magnitude and will result in reversal of the conviction absent the error being harmless beyond a reasonable doubt. *See Adams*, 24 S.W.3d at 294; *see, e.g.*, *Shelton*, 851 S.W.2d at 138.

Because an issue regarding election of the offense involves a defendant's right to a fair trial, it is subject to plain error review even if it was not raised in the motion for a new trial. *See, e.g.*, *State v. Kendrick*, 38 S.W.3d 566, 570 (Tenn. 2001) (reversing conviction, as a matter of plain error, on election issue). Our supreme court has adopted the factors developed by this court to be considered

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899, S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The record must establish all five factors before plain error will be recognized and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 283. In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *Adkisson*, 899 S.W.2d at 642.

The Defendant argues that the State's election did not ensure that the jurors "found beyond a reasonable doubt that the same instance of sexual penetration resulted in [the victim's] pregnancy." As we have noted, the State presented evidence of multiple sexual penetrations. The State chose to rely upon the single instance of vaginal penetration that resulted in the victim's pregnancy. A medical expert testified that once fertilization occurred, subsequent acts of intercourse could not result in another conception or implantation.

From the election, the Defendant knew the specific instance of sexual penetration upon which the State sought a conviction. The election defines the offense in a manner that allows this court to review the sufficiency of the evidence. The election identified the offense sufficiently for the jurors to deliberate and reach a verdict of the Defendant's guilt of a single offense. We note that although a date was not identified in the election, a specific date is not required, and the offense may be identified by other descriptive facts. *See, e.g.*, *Shelton*, 851 S.W.2d at 137-38. In any event, the medical proof showed that an ultrasound performed on June 4, 2011, revealed the victim to have a fetus of seven weeks' fertilization age.

There is no indication the Defendant was unable to present a defense, such as that he did not have access to the victim during the time period of the conception. The evidence showed that he was with the victim every weekend during the relevant time period. *Cf. State v. Frederick Herron*, No. W2012-01195-CCA-R3-CD (Tenn. Crim. App. Jan. 17, 2014) (holding that election was adequate where the State specified the offense occurred the night before the victim's first menstrual cycle). *But cf. State v. Roland R. Smith*, No. M2004-01457-CCA-R3-CD (Tenn. Crim. App. June 29, 2005) (holding that the State's election of sexual intercourse resulting in the victim's pregnancy was inadequate where the proof showed that the victim twice became pregnant from the defendant's actions), *overruled on other grounds by State v. Collier*, 411 S.W.3d 886, 896 (Tenn. 2013). Because the Defendant has not shown that the State's election was inadequate, no error occurred, and he is not entitled to plain error relief. *See Adams*, 24 S.W.3d at 294; *Smith*, 24 S.W.3d at 282.

**III**

The Defendant contends that the trial court erred in admitting the DNA evidence. He contends that although Scales Laboratory held ASCLD accreditation for general forensic testing, it lacked AABB paternity testing accreditation. He argues that Tennessee Code Annotated section 24-7-112(a)(3) (2000) required accreditation by an entity designated by the secretary of health and human services. The State contends that the Code section does not apply to criminal prosecutions under title 39, chapter 13 of Tennessee Code Annotated and that a laboratory's accreditation is a factor to be considered in weighing, but not admitting, evidence. We agree with the State.

Tennessee Code Annotated section 24-7-112 provides for paternity testing "[i]n any contested paternity case" and empowers the court or the department of human services to order testing, subject to certain limitations, if requested and supported by an affidavit of the requesting party which alleges or denies paternity. Subsection (a)(3) states:

> In any civil or criminal proceedings pursuant to this section, the tests ordered shall be conducted by an accredited laboratory. In the case of genetic tests, and at such time as the secretary of health and human services designates accreditation entities which acknowledge the reliability of types of genetic tests used in the establishment of paternity, such genetic tests shall be of the type which are generally acknowledged as reliable by accreditation entities designated by the secretary and the genetic tests shall be performed by a laboratory approved by such a designated accreditation entity.

T.C.A. § 24-7-112(a)(3).

We note that section 24-7-112 applies to "any contested paternity case" and that subsection 24-7-112(a)(3) refers to "criminal proceedings." The State argues that subsection (a)(3)'s reference to "proceedings pursuant to this section" should be limited to proceedings under title 24, or at most, chapter 7 of title 24. In *State v. Smith*, 735 S.W.2d 831, 834-35 (Tenn. Crim. App. 1987), though, this court relied upon a previous version of section 24-7-112 in determining whether expert testimony about blood-grouping tests was admissible to prove paternity in an aggravated rape case involving a child victim. *See also* Neil P. Cohen, *et al.*, Tennessee Law of Evidence § 7.02[19][b] (discussing section 24-7-112 as applying to admissibility of paternity tests in civil and criminal cases) (6th ed. 2011).

As we have stated, section 24-7-112 contemplates court- or agency-ordered testing of the child and the parties. In the present case, the Defendant voluntarily provided his DNA to Sergeant Black. We note that our court of appeals has said that the parties in a paternity action waived the formal requirements of section 24-7-112 by submitting voluntarily to blood testing. *Shell v. Law*, 935 S.W.2d 402, 410 (Tenn. Ct. App. 1996).

In any event, the Defendant alleges that AABB accreditation is required and that ASCLD accreditation is insufficient under the statute, but he has not provided any support for this claim. In Tennessee, DNA analysis evidence is admissible "without antecedent expert testimony that DNA analysis provides a trustworthy and reliable method of identifying characteristics in an individual's genetic material upon a showing that the offered testimony meets the standards of admissibility set forth in the Tennessee Rules of Evidence." *Id.* § 24-7-118(b)(1) (2000). A party may, however, offer evidence that DNA analysis is not a "trustworthy and reliable method of identifying characteristics in an individual's genetic

material" or that the analysis done in the case lacked trustworthiness and reliability. *Id.* § 24-7-118(b)(2).

Rules 702 and 703 of the Tennessee Rules of Evidence address the admissibility of opinion testimony of expert witnesses. Rule 702 states in pertinent part: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tennessee Rule of Evidence 703 requires the expert's opinion to be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002). Evidence constitutes "'scientific, technical, or other specialized knowledge,' if it concerns a matter that 'the average juror would not know, as a matter of course.'" *State v. Murphy*, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting *State v. Bolin*, 922 S.W.2d 870, 874 (Tenn. 1996)). Questions regarding the admissibility, qualifications, relevancy, and competency of expert testimony are left to the discretion of the trial court. *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263-64 (Tenn. 1997). A trial court's ruling on the admissibility of such evidence may be overturned on appeal only if the discretion is exercised arbitrarily or abused. *Stevens*, 78 S.W.3d at 832.

We conclude that Dr. Scales's testimony about the DNA testing was not barred by Tennessee Code Annotated section 24-7-112 and that it was admissible pursuant to section 24-8-118 and Tennessee Rules of Evidence 702 and 703. Dr. Scales testified that his laboratory complied with the rigorous protocols necessary to obtain and maintain ASCLD accreditation. The Defendant was permitted to cross-examine Dr. Scales about the laboratory's credentials and the testing Dr. Scales performed in the present case. The trial court did not abuse its discretion in admitting his testimony about the DNA analysis. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE