# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 5, 2014

## STATE OF TENNESSEE v. CORDELL BUFFORD

**Appeal from the Criminal Court for Shelby County**
**No. 11-03558     Chris Craft, Judge**

---

**No. W2013-00841-CCA-R3-CD  - Filed May 20, 2014**

---

The defendant, Cordell Bufford, appeals his Shelby County Criminal Court jury conviction of rape of a child, claiming that the trial court erred by refusing to enforce a plea agreement with the State, by denying his request for funds to hire an expert witness, by denying his motions to exclude certain evidence, by prohibiting cross-examination of the victim's mother about the victim's previous sexual abuse pursuant to Tennessee Rule of Evidence 412, and by denying his request for a special jury instruction. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Timothy J. Williams and Krista Holder-Williams, Memphis, Tennessee, for the appellant, Cordell Bufford.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Abby Wallace and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The defendant's conviction relates to a single incident of his raping the then seven-year-old victim, M.M., on June 12, 2009.[1]

At the September 2012 trial, the victim's mother, J.M., testified that in June

---

[1]As is the policy of this court, we identify the minor victim only by her initials.

2009, she and her four children lived at the Millington Inn with the defendant, who was J.M.'s boyfriend at the time.[2] She said that neither she nor the defendant owned a car, so they often borrowed the defendant's mother's van. On the morning of June 12, 2009, the defendant drove the van from the Millington Inn to pick up his mother and take her to work. J.M. said that the defendant "was going to wash some clothes" and that the victim "went with him to play on the computer [and] to make sure that he could get the van to take [J.M.] to the doctor later that day." She explained that the defendant's mother was more likely to allow the defendant to keep her van if one of the children was with him. She said that it was the defendant's idea to take the victim rather than any of the other children with him. The defendant and the victim left the Millington Inn at approximately 7:15 a.m., and she next spoke with the defendant at approximately 10:00 a.m. J.M. said that she telephoned the defendant to ask "about how long they were going to be . . . because [J.M.] had to go to the doctor." She explained that she did not have a doctor's appointment but that she "just wanted to go to the doctor." She said that the defendant promised to arrive "[s]hortly," and when he did not, she "tried to call back" sometime around noon. J.M. said that the defendant did not answer the telephone and that she did not speak with him until sometime between 2:00 p.m. and 3:00 p.m.

J.M. testified that she remained at the Millington Inn all day and that the defendant did not pick her up at any point and drive her to the walk-in clinic. She said that when the defendant and the victim returned to the Millington Inn, the defendant "seemed a little like . . . he had been drinking." The victim, she said, "was just real quiet, which is not like her." J.M. recalled that when she went outside the motel room to smoke a cigarette, the victim followed her. At that point, the victim told J.M. that the defendant "had touched her and that he put his private in her private and peed on her." The victim told J.M. that "she told [the defendant] to stop and that she was crying and he told her to shut up, he was going to whoop her." The victim also told J.M. that the defendant "pulled up some pornographic pictures just girls kissing on girls, stuff like that." The defendant did not object to this testimony as hearsay or on any other ground. Following the victim's revelation, J.M. took the victim "into the bathroom and looked at her and noticed she had been bleeding at one point in time." She said that she and the victim remained in the motel room with the defendant and the other children while a heavy storm raged outside. She said that after the storm stopped and after the defendant fell asleep, she "took all [her] children up to the front office and called the police."

J.M. said that she and the victim gave statements to a Shelby County Sheriff's Office ("SCSO") detective, who then transported J.M. and the victim to Le Bonheur Children's Hospital ("Le Bonheur"), where the victim underwent "a gynecological exam."

---

[2]To protect the anonymity of the minor victim, we also refer to the victim's mother by her initials.

J.M. said that she did not change the victim's clothing or underwear between the time that the defendant and the victim arrived back at the motel and the time she telephoned the police. She said that she did not give the victim a shower or a bath during the intervening time.

During cross-examination, J.M. testified that when the victim returned to the Millington Inn with the defendant, she was wearing a matching pink shorts and shirt set that "wasn't one of her outfits at all" and underwear that did not belong to the victim either. J.M. maintained that she and the defendant never engaged in sexual relations in the motel room while the children slept in the next bed. J.M. clarified that she saw blood in the victim's underwear but not on her body, explaining, "Her body was really red and irritated looking. But I didn't see [blood] on her." She denied that the victim had ever had trouble with her bottom becoming irritated by bubble bath.

SCSO Deputy Ronald Sneed, who responded to the Millington Inn in response to J.M.'s 9-1-1 call, testified that J.M. told him that the victim reported that while the victim and the defendant were at the defendant's mother's house, the defendant "removed her clothing from her and assaulted her by placing his private part inside of her private part." Deputy Sneed said that J.M. reported that the victim "informed [J.M.] that she felt like [the defendant] had urinated inside of her and that a white substance had come from his private area." J.M. also told Deputy Sneed that the victim said that the defendant threatened "to continue the assault the rest of her life and also harm her in other ways." Deputy Sneed said that he only spoke briefly with the victim because "protocol" dictated that he allow her formal statement to be taken by a female detective.

M.M., who was 10 years old at the time of trial, testified that in June 2009, she was seven years old and living in the Millington Inn with her mother, her three brothers, and the defendant. She said that she sometimes went with the defendant to his mother's house to play with the defendant's daughters, jump on the trampoline, and play "a cooking game" on the defendant's mother's computer. She recalled that one morning in June 2009, she went with the defendant to pick up his mother and take her to work. She and the defendant then went back to the defendant's mother's house, where she played on the computer for a short time before the defendant told her to "[c]ome away from" the computer. She testified that the defendant showed her "[n]asty pictures of naked girls" on the computer before he told her to go into his daughters' room because it was "time to go to sleep." The victim stated that she complied with the defendant's directive, and the defendant followed her into the room.

While they were in the bedroom, the defendant removed the victim's pants and "pulled [her] panties halfway down." M.M. testified that the defendant then "put his private part into [her] private part." She said that "[i]t hurt" and that she asked him to stop, but he

did not stop until after he had "peed on [her] leg." The victim also recalled that the defendant forced her to "rub[] some grease" from a container with "a blue top" onto his penis "[a]fter he put his private part into [her] private part." She said that the "grease" was the same as that J.M. applied to her lips. She testified that the defendant then put his penis into her mouth. M.M. said that she cried during the incident. After the offenses, the defendant "wiped it up with a black shirt" and put the shirt on the dresser. The victim testified that the defendant gave her clothes, including panties, to put on after the offenses and that the clothing did not belong to her. She recalled that she wore these same clothes for the remainder of that day until she went to the hospital for an examination.

During cross-examination, the victim acknowledged that her mother said that the victim would get in "[b]ad trouble" if her trial testimony did not match her statement to the police in June 2009. The victim denied ever having seen anyone engaging in sexual intercourse and denied ever having had a dream about someone having sex with her. She also denied that one of her brothers placed his penis inside her vagina. She admitted that one of her brothers had forced her to perform fellatio on him when she was four years old.

During redirect examination, the victim clarified that her mother told her to tell the truth at trial, and she had done so. The victim said that she did not dream the offenses committed by the defendant. The victim said that she reported the incident involving her brother to her mother and that her brother had admitted the act.

SCSO Sergeant Karla Lipford, who responded to Deputy Sneed's call for assistance, testified that she spoke with Officer Sneed and J.M. and that she attempted to interview the victim and the defendant. Sergeant Lipford said that she did not obtain a statement from the defendant because he asked for an attorney. The victim, she said, refused to give a statement because it was late and she was tired. Sergeant Lipford testified that she drove J.M. and the victim to Le Bonheur so that the victim could undergo a forensic examination. Sergeant Lipford testified that she collected the rape kit from Le Bonheur and transported it to the sheriff's office property room, where it remained until it was transported to the Tennessee Bureau of Investigation ("TBI") for testing.

Sergeant Lipford said that she did not arrest the defendant that night because she did not have confirmation of the victim's allegations. She later telephoned the defendant and asked if he would come to the sheriff's office for an interview, and he agreed. The interview took place on November 11, 2009. She provided the defendant with *Miranda* warnings, and he provided a statement. A video recording of the defendant's statement was played for the jury.

In his statement, the defendant testified that on June 12, 2009, he and M.M.

-4-

drove in his mother's van to pick his mother up and drive her to work. The defendant said that after taking his mother to work, he and M.M. returned to his mother's house so that he could do several loads of laundry. The defendant told Sergeant Lipford that he and M.M. left his mother's house at approximately 9:30 a.m. and returned to the Millington Inn so that the defendant could drive J.M. to the walk-in clinic. He said that after dropping J.M. off at the clinic, he and M.M. returned to his mother's house to finish the laundry. The defendant denied showing M.M. pornographic images on the computer. He also denied having any sexual contact with M.M., saying, "[I]t sound like it was staged to me you know maybe she her momma don't wanna pay me my money that she owe me you know that's how I took it."

Ashley Weiderhold Piper, a nurse practitioner who worked in the Child Assessment Program at Le Bonheur, testified that she performed the forensic examination of the victim. Ms. Piper said that the victim "reported that her mother's boyfriend made her watch movies with him and touched her and peed in her." Ms. Piper said that before conducting the genital examination, she collected the victim's underwear and "placed it in the evidence bag for underwear which is in the sealed evidence box from the Tennessee Bureau of Investigation." She explained that the "rape kit" box "contains packaging for underwear as well as separate packaging for vaginal swabs, anal swabs, oral swabs, any additional swabs as well as pubic hair combings." Ms. Piper testified that during a visual examination of the victim's genitals, she "noted that [the victim] had some generalized redness or erythema as well as a notch or a hump of tissue at around seven o'clock. . . . There were no lacerations, no bleeding, no discharge." Ms. Piper said that it was her professional opinion that the redness on the victim's genitals, her painful urination, and the notch in her hymen supported the victim's claim of sexual abuse.

During cross-examination, Ms. Piper stated that she did not swab or otherwise inspect the victim's underwear but simply collected the underwear and placed it into the bag contained in the rape kit. Ms. Piper said that she did not observe any blood on the victim's underwear. Ms. Piper conceded that the presence of the notch in the victim's hymen did not necessarily indicate sexual penetration.

TBI Special Agent and Forensic Scientist Jessica Marquez testified that she performed deoxyribonucleic acid ("DNA") testing using the items contained in the rape kit obtained from the victim and the buccal swab obtained from the defendant. Agent Marquez stated that each of the items she received from the SCSO was in a sealed evidence container. She created a DNA profile for the defendant using the known standard sent to her by the SCSO and a DNA profile for the victim using the known standard from the rape kit. Agent Marquez testified that DNA testing on an oral swab taken from the victim established that it was negative for the presence of semen. A vaginal swab taken from the victim tested positive for the presence of semen and sperm but negative for the presence of saliva. DNA

testing of the vaginal swab revealed "[a] mixed DNA profile" that was consistent with the victim and the defendant. Agent Marquez testified that the "crotch area" of the victim's underwear tested positive for the presence of semen and sperm. DNA testing on the victim's underwear conclusively established that the semen and sperm inside the underwear came from the defendant.

During cross-examination, Agent Marquez testified that she had no test to determine when the defendant's DNA was deposited onto the victim's underwear. She admitted that she could not say with certainty that the defendant's DNA came to be on the victim's underwear via sexual activity. Agent Marquez conceded that it was possible that the defendant's DNA could have been transferred to the victim's vagina via her underwear and that the defendant's semen and sperm could have been deposited on the victim's underwear if the defendant had used the underwear to clean himself after having sex with J.M.

Agent Marquez conceded that DNA from a third individual also appeared to be on the victim's underwear, but the amount of that DNA did not meet TBI testing thresholds. The DNA contributed by the third individual was on the non-sperm portion of the underwear and was in an amount that indicated that it "could be a touch DNA sample."

During redirect examination, Agent Marquez reiterated that the unknown DNA contribution was only in the non-sperm portion of the sample and that it was "consistent with a touch DNA sample." Agent Marquez said that it was "not likely" that the defendant's DNA discovered inside the victim's vagina came from a transfer rather than from sexual activity.

Following Agent Marquez's testimony, the victim returned to the stand for the limited purpose of authenticating the video recording of the forensic interview she gave on July 1, 2009. That video, portions of which were redacted by the agreement of the parties, was not admitted as substantive evidence but as a prior consistent statement to rehabilitate the victim's credibility, which had been challenged by the defendant. After the presentation of the redacted video recording, the State rested.

The defendant, after a full *Momon* colloquy, elected not to testify but did choose to present proof.

Doctor William Watson, who described himself as an "independent forensic consultant," testified that he had obtained a bachelor's degree in microbiology from Texas State University, a master's degree in biology from University of North Texas, and a Ph.D. in molecular biology from the University of North Texas. Doctor Watson explained that he

examined the records of DNA testing on the various items that was performed by Agent Marquez. He stated that he did not disagree with any of Agent Marquez's findings but that he was concerned because the report generated by Agent Marquez did not indicate the presence of the third, unknown DNA contributor. He said, "[T]here is an omission in the report. It doesn't include any information about the third unknown contributor to this sample." Doctor Watson stated that, as a result, it was his opinion that Agent Marquez's report did not meet accepted laboratory standards.

Doctor Watson agreed that the semen and sperm on the victim's underwear belonged to the defendant. He said, however, that the defendant's DNA could have been transferred to the victim's underwear in a variety of ways that did not involve sexual contact. He noted, for example, that the DNA could have been transferred to the victim's underwear if she came into contact with the defendant's ejaculate on the defendant's bedding. Doctor Watson admitted that he could not definitively say how the defendant's DNA came to be in the victim's underwear. Doctor Watson observed that it was also possible that the DNA found on the victim's genitals was transferred there from her underwear.

During cross-examination, Doctor Watson reiterated that he did not dispute any of the conclusions made by Agent Marquez. Doctor Watson conceded that it was possible that the defendant's DNA was deposited inside the victim's vagina via penile penetration.

Bernice Pigram, the defendant's mother, testified that when she washed the bedding from her granddaughters' bed on the Saturday following June 12, 2009, she did not observe any blood or semen on the sheets. Ms. Pigram also testified that the underwear collected from the victim following the offense was not underwear that she had purchased for either of her granddaughters. Ms. Pigram said that at that time, the victim was "bigger than [her] girls" and that, as a result, the victim could not have shared clothing with her granddaughters.

The defendant's 12-year-old daughter, Abria Watson, testified that in June 2009, the victim was too large to share clothing with Abria or her sister.

Based upon this testimony, the jury convicted the defendant as charged of one count of rape of a child. Following a sentencing hearing, the trial court imposed a 25-year sentence to be served at 100 percent by operation of law.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by denying his motion to enforce the plea agreement; that the trial court erred by denying his ex parte motion for funds to hire a "gynecological expert;" that the trial court erred by denying

his motion to suppress the victim's underwear based upon the State's failure to establish a sufficient chain of custody; that the trial court erred by refusing to suppress "inconclusive" results of tests conducted on the victim's vaginal swab; that the trial court erred by prohibiting him from cross-examining the victim's mother about the victim's previous claim of sexual abuse; and that the trial court erred by denying a specially requested jury instruction on the State's duty to collect and preserve evidence. We consider each claim in turn.

## *I. Plea Agreement*

The defendant asserts that the trial court erred by refusing to force the State to honor a plea offer made to the defendant shortly after his indictment. He claims that his reliance on the agreement prejudiced the development of his defense. The State contends that the trial court did not err because there was no agreement between the parties.

It is well-settled that "[a]n offer to plea bargain is 'revocable until accepted by the trial court.'" *State v. Street*, 768 S.W.2d 703, 711 (Tenn. Crim. App. 1988) (quoting *State v. Turner*, 713 S.W.2d 327, 329 (Tenn. Crim. App. 1986)). In consequence, a plea agreement remains unenforceable as to either party prior to acceptance by the trial court.

The record establishes that not only had the trial court not accepted the plea agreement, no plea agreement ever existed between the parties. The State made an offer to the defendant, which counsel apparently communicated to the defendant at some point between June 2010 and November 2010. The defendant did not immediately accept the offer. In the interim, a new prosecutor took over the case against the defendant and withdrew the plea offer. When defense counsel communicated the withdrawal of the offer to the defendant, the defendant told counsel that he had "been planning on taking the offer but he wanted to take the offer under Alford v. North Carolina." Counsel said that the defendant "signed the paperwork" to enter a guilty plea after the prosecutor withdrew the offer. The trial court concluded that because the offer "had not been accepted at the time it was revoked, there is no contract and never was any contract." The court found that because no plea agreement had been made, the State had not breached the agreement. The trial court also correctly ruled that it lacked the authority to force the State to reinstate the earlier offer. Because no plea agreement existed, the trial court did not err by denying the defendant's motion.

## *II. Expert Witness Funds*

The defendant next contends that the trial court erred by denying his request for funds to hire a "gynecological expert" to assist in his defense. The State asserts that the defendant waived our consideration of this issue by failing to include the motion or the order

disposing of the motion in the appellate record.

Tennessee Supreme Court Rule 13, section 5, governs the provision of funds to procure the assistance of expert assistance for an indigent defendant: "[T]he court, in an ex parte hearing, may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected." Tenn. Sup. Ct. R. 13, § 5(b); *see also* T.C.A. § 40-14-207(b) (2005) (authorizing funding for expert services to an indigent defendant pursuant to the supreme court rules). "Funding shall be authorized only if, after conducting a hearing on the motion, the court determines that there is a particularized need for the requested services . . . ." Tenn. Sup. Ct. R. 13, § 5(c)(1). To establish a "particularized need," the defendant must show "by reference to the particular facts and circumstances that the requested services relate to a matter that, considering the inculpatory evidence, is likely to be a significant issue in the defense at trial and that the requested services are necessary to protect the defendant's right to a fair trial." *Id.* § 5(c)(2); *see also State v. Barnett*, 909 S.W.2d 423, 430 (Tenn. 1995).

Our supreme court has adopted a two-pronged test to determine "particularized need": "(1) the defendant must show that he or she 'will be deprived of a fair trial without the expert assistance'; and (2) the defendant must show that 'there is a reasonable likelihood that [the assistance] will materially assist [him or her] in the preparation of [the] case.'" *State v. Scott*, 33 S.W.3d 746, 753 (Tenn. 2000) (quoting *Barnett*, 909 S.W.2d at 430) (alterations is *Scott*). Most importantly, the need for expert services must "be determined on a case-by-case basis, and in determining whether a particularized need has been established, a trial court should consider all facts and circumstances known to it at the time the motion for expert assistance is made." *Barnett*, 909 S.W.2d at 431. The trial court's denial of expert services will not be overturned absent a showing that the trial court abused its discretion. *See Barnett*, 909 S.W.2d at 431.

The defendant contends that he filed an ex parte motion for funds to hire a "gynecological expert," which expert, he claimed, would "assist him in refuting any assertion by the state that the physical evidence and observations of the nurse proved penetration" and "explore the defendant's theory that the evidence actually disproved penetration." As the State correctly points out, however, neither the defendant's motion nor the trial court's order disposing of the motion appears in the record on appeal.

The appellant bears the burden of preparing an adequate record on appeal, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), which includes the duty to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). If the appellant fails to file an adequate record,

this court must presume the trial court's ruling was correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). Because the defendant failed to include the motion or the order in the record on appeal, we must presume that the ruling of the trial court relative to his request was correct.

### III. *Chain of Custody*

The defendant asserts that the trial court erred by refusing to exclude from evidence the underwear collected from the victim during her forensic examination. Prior to trial, the defendant moved the court to exclude the underwear on grounds that the State had failed to reference the panties in its initial discovery materials. He appears to claim on appeal that this failure resulted in a failure of the State to establish an appropriate chain of custody for the underwear prior to its admission at trial. The State avers that the trial court did not err by refusing to exclude the evidence.

"Whether the requisite chain of custody has been established to justify admission . . . is 'a matter committed to the discretion of the trial judge and [t]his determination will not be overturned in the absence of a clearly mistaken exercise thereof.'" *Davis v. Shelby County Sheriff's Dep't*, 278 S.W.3d 256, 267 (Tenn. 2009) (quoting *Shell v. Law*, 935 S.W.2d 402, 409 (Tenn. Ct. App. 1996)). Accordingly, this court will not reverse the trial court's ruling on the chain of custody "unless the trial court 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *State v. Cannon*, 254 S.W.3d 287, 295 (Tenn. 2008) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

Although "it is 'well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody,'" *Cannon*, 254 S.W.3d at 296 (quoting *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000)), the general rule "does not require that the identity of tangible evidence be proven beyond all possibility of doubt," *Cannon*, 254 S.W.3d at 296. The State need not "call all of the witnesses who handled the item." *Id.* (citing *State v. Johnson*, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984)). So long as the State can "reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id*.

Here, J.M. testified that she did not change the victim's clothing after the victim made her claim of abuse. Instead, the victim remained in the same underwear and clothing until she removed it later that evening before her forensic examination. Ms. Piper testified that she collected the victim's underwear and placed it inside a bag inside the rape kit. Sergeant Lipford collected the rape kit and placed it in the property room at the SCSO.

Agent Marquez testified that the underwear arrived at the TBI for testing in the same sealed bag in which they had been placed by Ms. Piper. No evidence suggested that either the bag or the underwear had been tampered with in any way. Similarly, no evidence suggested that the underwear tested by Agent Marquez was not the same underwear that the victim put on following the sexual assault. That the initial batch of discovery materials from the State failed to reference the underwear is wholly irrelevant to the question of whether the State established a sufficient chain of custody. Thus, because the evidence presented sufficiently established the chain of custody of the underwear, the trial court did not err by admitting the evidence or the testimony regarding the tests performed on it.

*IV. Motion in Limine*

The defendant next contends that the trial court erred by denying his motion to exclude evidence of DNA testing conducted on the vaginal swab taken from the victim. The defendant claims that because the testing was "inconclusive" the results should have been excluded under the terms of Tennessee Rule of Evidence 403. The State avers that the trial court ruled correctly.

Prior to trial, the defendant moved to exclude the results of DNA testing performed on the vaginal swab taken from the victim, claiming that because the results were "inconclusive," the probative value of the results was substantially outweighed by the danger of unfair prejudice that might arise from their admission. The trial court denied the motion, concluding that no danger of unfair prejudice arose from the actual scientific test results. The court noted that the defendant would be permitted to cross-examine the TBI forensic scientist regarding her methods and the results achieved from DNA testing.

Questions concerning the admissibility of evidence under Tennessee Rule of Evidence 403 rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)); *see also State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant,

it may be still be excluded "if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978).

We need not tarry long over the defendant's claim because the record belies his assertion that results of DNA testing performed on the vaginal swab were truly "inconclusive." The report generated by Agent Marquez stated that the mixed DNA profile on the vaginal swab was "consistent with" the victim and the defendant "at 6 of 9 loci and the gender marker amelogenin. Loci FGA, D5S818, and D7S820 are inconclusive due to insufficient or degraded DNA." This statement does not reflect that the results were entirely inconclusive. Indeed, Agent Marquez went on to report that the "probability of obtaining this mixed profile from unrelated individuals" from the "African-American population is approximately 1 in 4,900;" from the "Caucasian population is approximately 1 in 5,429;" from the "Southeastern Hispanic population is approximately 1 in 7,962;" and the "Southwestern Hispanic population is approximately 1 in 5,336." The defendant thoroughly cross-examined Agent Marquez regarding the results. The trial court did not err by refusing to exclude this evidence.

*V. Tennessee Rule of Evidence 412*

The defendant complains that the trial court erred by prohibiting him from asking J.M. about the victim's previous report that one of her brothers had sexually assaulted her. The State contends that the trial court did not err because J.M.'s testimony on this subject would have been inadmissible hearsay. We agree with the State.

Prior to trial, the defendant moved for permission to present at trial records from the Department of Children's Services detailing the victim's earlier claim of sexual abuse by one of her brothers, claiming that the records were admissible under Tennessee Rule of Evidence 412 to establish that the young victim's knowledge of sexual matters came from an incident other than the one involving the defendant. The trial court denied the motion, deeming the records inadmissible hearsay, but ruled that the defendant would be permitted to ask the victim about the earlier instance of sexual abuse under the terms of Rule 412.

During cross-examination of J.M. at trial, the defendant sought to ask J.M. whether the victim ever reported that someone other than the defendant had penetrated her. The defendant claimed that the victim's statement regarding the previous incident made it

-12-

unclear whether her brother had penetrated her vagina with his penis and that he wanted to ask both the victim and J.M. to clear up the "inconclusive" prior statement. The defendant said that the purpose of that line of questioning was to establish that the notch in the victim's hymen could have come from the earlier incident. He also claimed that evidence of the earlier incident was necessary because "this other trauma could of caused her to have psychological problems to make her think that [the defendant had raped her] or not being able to differentiate between dreaming about the other act or this act." The trial court ruled that the defendant could ask the victim "if she had been sexually abused, or whatever the word is, by [her brother] to show the knowledge of sexual matters" and that the defendant could ask the victim "if she's been sexually penetrated before because of the notch in the hymen." The court held that the defendant would not be permitted to ask those questions of J.M., however, because J.M. had no personal knowledge of the incident because she "wasn't there" when the abuse occurred.

Tennessee Rule of Evidence 412, Tennessee's rape shield law, "reflect[s] the general view that evidence of prior sexual behavior is irrelevant or, if relevant, has little probative value compared to its prejudicial effect, unless the evidence is within one of the enumerated exceptions." *State v. Brown*, 29 S.W.3d 427, 430 (Tenn. 2000). "Rule 412 is a rule of relevance" designed "to exclude all evidence regarding the complainant's prior sexual behavior unless the procedural protocol is followed and the evidence conforms to the specifications of the Rule." *Id.* at 430. Rule 412 provides, in pertinent part, as follows:

> Notwithstanding any other provision of law, in a criminal trial, preliminary hearing, deposition, or other proceeding in which a person is accused of an offense under Tenn. Code Ann. § . . . 39-13-522 [rape of a child] . . . the following rules apply:
>
> . . . .
>
> (c) Specific instances of conduct.
>
> Evidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule, and the evidence is:
>
> (1) Required by the Tennessee or United States Constitution, or
>
> (2) Offered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim has presented

-13-

evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim, or

> (3) If the sexual behavior was with the accused, on the issue of consent, or

> (4) If the sexual behavior was with persons other than the accused,

>> (i) to rebut or explain scientific or medical evidence, or

>> (ii) to prove or explain the source of semen, injury, disease, or knowledge of sexual matters, or

>> (iii) to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe that the victim consented.

Tenn. R. Evid. 412(c).

Here, the defendant sought to ask the victim's mother about sexual abuse perpetrated against the victim by one of the victim's brothers when the victim was four years old. The defendant asserted that the purpose of seeking admission of evidence of the prior act was to explain the victim's knowledge of sexual matters and to potentially explain the source of the notch in the victim's hymen. Although these are permissible purposes under Rule 412, the trial court correctly determined that J.M. was not the appropriate witness through which to seek admission of that evidence. J.M. had no first hand knowledge of the earlier sexual abuse and knew only what the victim had told her. Thus, any testimony she offered on the matter would have been inadmissible hearsay. *See* Tenn. R. Evid. 801. The court also correctly ruled that the defendant would be permitted to ask the victim about the earlier abuse under the terms of Rule 412.

The defendant also argues that the trial court's ruling that he would not be permitted to question J.M. about the victim's earlier abuse deprived him of the right to present a defense. Although "[p]rinciples of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony" favorable to his

-14-

cause, *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *Brown*, 29 S.W.3d at 431), that right is not without limits, *see Flood*, 219 S.W.3d at 316 (citing *Chambers*, 410 U.S. at 302). Indeed, the Supreme Court has observed that "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence." *Chambers*, 410 U.S. at 302. "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Chambers*, 410 U.S. at 302). As indicated, the trial court did not prevent the defendant from presenting the evidence he desired but simply limited the presentation of that evidence in accord with the rules of evidence. The defendant is not entitled to relief on this issue.

## *VI. Jury Instruction*

The defendant contends that the trial court erred by denying his request for a jury instruction regarding the State's duty to collect and preserve evidence. He claims that proof that the State could have collected evidence such as the black t-shirt allegedly used to clean up after the rape of the victim or swabs from the defendant's penis warranted the giving of such an instruction. The State avers that the evidence did not justify the giving of the defendant's requested instruction.

As the trial court correctly noted, the pattern jury instruction regarding the State's duty to preserve evidence had its genesis in *State v. Ferguson*. In that case, our supreme court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *State v. Ferguson*, 2 S.W.3d 912, 915-16 (1999)). The court observed that "the due process required under the Tennessee Constitution was broader than the due process required under the United States Constitution," *Merriman*, 410 S.W.3d at 784 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (holding "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law")), and rejected the "bad faith" analysis espoused by the United States Supreme Court in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial," *Merriman*, 410 S.W.3d at 785. The supreme court "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." *Id.* at 784-85 (citing *Ferguson*, 2 S.W.3d at 914, 917).

To facilitate this "balancing approach," our supreme court ruled that the trial

court must first "determine whether the State had a duty to preserve the evidence," *Merriman*, 410 S.W.3d at 785, and observed that the State's duty to preserve was "limited to constitutionally material evidence," *id.* The court held that to be "constitutionally material," the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (citing *Ferguson*, 2 S.W.3d at 915, 918). "If the trial court determines that the State had a duty to preserve the evidence, the court must determine if the State failed in its duty." *Merriman*, 410 S.W.3d at 785 (citing *Ferguson*, 2 S.W.3d at 917). If the trial court concludes that the State lost or destroyed evidence that it had a duty to preserve, the trial court must then consider three factors to determine the appropriate remedy for the State's failure:

> "(1) [t]he degree of negligence involved;
> (2) [t]he significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
> (3) [t]he sufficiency of the other evidence used at trial to support the conviction."

*Merriman*, 410 S.W.3d at 785 (quoting *Ferguson*, 2 S.W.3d at 917). "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Merriman*, 410 S.W.3d at 785-86.

Importantly, the defendant makes no allegation that the State lost or destroyed any piece of evidence. Instead, he claims that the State should have collected more evidence because that evidence *might have been* exculpatory. That is not the standard required for the giving of an instruction under *Ferguson*. Consequently, the trial court did not err by denying the defendant's requested instruction.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-16-