**Beverly Sue SHELL, Plaintiff–Appellee,**

v.

**William A. LAW, Defendant–Appellant.**

Court of Appeals of Tennessee,
Eastern Section.

May 24, 1996.

Permission to Appeal Denied by
Supreme Court Dec. 2, 1996.

R. Wayne Culbertson, Timothy R. Wilkerson, Kingsport, for Defendant–Appellant.

John S. Taylor, Johnson City, for Plaintiff–Appellee.

## OPINION

McMURRAY, Judge.

This is a rather bizarre case. The plaintiff brought this action for the purpose of establishing the paternity of her child, Adam C. Edmondson. After a jury trial, a jury verdict was rendered finding the defendant, Mr. Law, to be the father of Adam. Judgment was entered on the jury verdict and this appeal resulted. We affirm the judgment of the trial court.

## FACTS

Generally stated the following is a recitation of the material facts in this case. Many details not considered germane to this appeal are omitted.

The parties, prior to the marriage of either, were involved in a relationship with each other which lasted for a short period of time. Subsequently, the plaintiff, Ms. Shell, married Glen Lee Edmondson. During her marriage to Edmondson, Adam C. Edmondson, the subject of this action, was born. Mr. Edmondson was originally a party to this action, however, a voluntary non-suit was taken as to him. The case proceeded as a paternity action against the defendant, William A. Law.

The defendant is a practicing attorney. After the plaintiff had been married to Mr. Edmondson for a short period of time, the plaintiff engaged Mr. Law to represent her in a divorce action. In November 1984, the parties met on a professional basis for the purpose of initiating the divorce proceedings. After occasional meetings at the defendant's office, the parties on one occasion went to a restaurant for dinner and drinks. They

thereafter went to Mr. Law's house where they engaged in sexual intercourse according to the testimony of Ms. Shell. Mr. Law asserts that he did not have relations with Ms. Shell until after the divorce was granted. He insists that two or three days after the divorce, she came to his house and the parties did engage in sexual relations.

In any event, it appears that before learning that she was pregnant, Ms. Shell and Mr. Edmondson were divorced. Subsequently, Ms. Shell discovered that she was pregnant and the divorce was set aside. The Edmondsons attempted a reconciliation and resumed marital relations. Ms. Shell believed that the pregnancy was a result of the marital relations since she and Mr. Law had engaged in sexual intercourse only on one occasion. In any event, there is evidence that Ms. Shell had sexual relations with both Mr. Law and Mr. Edmondson at the time during which conception would, in the due course of nature, have taken place.

The Edmondsons were finally divorced in 1989. In her divorce proceeding, Ms. Shell alleged that the child in question was born of her union with Mr. Edmondson. Ms. Shell was granted custody of the child and Mr. Edmondson was granted liberal visitation privileges. Additionally, he was ordered to pay child support. He later petitioned the court seeking an order granting specific visitation privileges.[1]

At some time, Ms. Shell, due to a similarity of features and other things began to suspect that Mr. Law was the father of the child. Mr. Law, Ms. Shell and the child voluntarily submitted to blood tests to determine parentage. Mr. Edmondson did not participate in the blood tests. At the trial, testimony was admitted by an expert witness who stated that according to his DNA tests, there was a 99.79 percent probability that Mr. Law was the father. Thereafter this action was filed. The issue of paternity was tried before a jury in circuit court. The jury found the defendant to be the father of the child.

---

1. Apparently, before final action was taken on Mr. Edmondson's petition, Mr. Edmondson and Ms. Shell were both satisfied that Mr. Law was the father. They so stipulated and the parental rights of Mr. Edmondson were terminated.

## ISSUES

The defendant presents a multiplicity of issues for our consideration which are as follows:

1. Whether the trial court committed reversible error by erroneously instructing the jury regarding the presumption of legitimacy and also by establishing paternity in Law despite the child being the legitimate child of Glenn Lee Edmondson, irrebuttably presumed to be so due to his marriage to Shell and cohabitation with her during the time of conception?

2. Whether there is jurisdiction under the paternity statutes of the State of Tennessee to bring an action to establish paternity of a legitimate child in another other than the legitimate father of the child?

3. Whether the trial judge committed reversible error by not barring Shell from relitigating the paternity of the child which was already established by her divorce decree and also from asserting certain factual matters totally at odds with those previously represented to the court in the divorce action?

4. Whether the trial court committed reversible error in allowing the introduction of proof of DNA evidence that did not comply with the requirements governing the introduction of DNA evidence in paternity suits?

5. Whether the trial court committed reversible error by allowing DNA evidence developed from blood samples without a showing of a proper chain of custody for those blood samples?

6. Whether, under the facts of this case, Shell is guilty of laches and should have been barred from pursuing the question of her child's paternity against Law?

7. Whether the legitimate father of the child was an indispensable party to this paternity suit?

8. Whether the trial court committed reversible error by cutting short Law's testimony pertaining to the issue of laches at a crucial point in the trial and by not reading to the jury Law's proposed jury instruction on the issue of laches at the close of the proof?

9. Whether the judgment of the trial court was in error, not supported by the evidence and should be reversed or remanded for new trial for the reason that the evidence as set forth in the record is not sufficient and does not support the finding that Law is the legal father of the child?

## STANDARD OF REVIEW

Our review of a judgment based upon a jury verdict is governed by Rule 13(d), Tennessee Rules of Appellate Procedure. Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict. We note, however, that there is a substantial body of case law that, as a matter of law, requires certain facts be established by clear, cogent and convincing evidence. For example the presumption of legitimacy may be overcome only by clear, cogent and convincing proof. We will, therefore, when we reach issues requiring the evidence to be clear, cogent and convincing, examine the record to determine if there is sufficient proof to constitute clear, cogent and convincing evidence to support the findings of the jury.

## DISCUSSION OF THE ISSUES

In his first issue, the defendant claims that the court erred in its instructions to the jury regarding the presumption of legitimacy. He argues that the presumption is irrebuttable due to the marriage and cohabitation of Ms. Shell and Mr. Edmondson during the time of conception.

The trial court instructed the jury as follows:

... the law presumes that the man plaintiff was married to at the time of the birth of the child is the father of the child. So this presumption of the law is that Mr. Edmondson, the man that the plaintiff was married to at the time of this child we have been talking about, is the father of the child. And a presumption means a fact or group of facts assumed to be true in law.

Now this legal presumption that we're dealing with may be overcome by clear, cogent and convincing evidence that one other than the man plaintiff was married to at the time of the child's birth is the child's father.

■ The court further defined "clear, cogent and convincing" evidence and placed the burden of proof upon the plaintiff. We find no error in the way and manner in which the court instructed the jury on this issue. We acknowledge that at common law and in the earlier stages of the development of the common law in this jurisdiction, the presumption that a child born during marriage was legitimate was for all practical purposes conclusive. Indeed it has been said that "[t]his presumption obtained as to a child born in marriage, no matter how soon after the marriage a birth followed; that is to say, the child was presumed to be legitimate, unless it was shown that the husband was impotent or beyond the four seas during the period when the child must in the course of nature have been begotten." *Jackson et al. v. Thornton et al.*, 133 Tenn. 36, 179 S.W. 384 (Tenn. 1915); *Cunningham v. Golden*, 652 S.W.2d 910 (Tenn.App.1983).

■ The presumption of legitimacy has been somewhat eroded, however, and the "beyond the four seas" has been replaced with the simple "non-access" concept. The failure to demonstrate non-access, however, does not render the issue of paternity irrebuttable as the appellant insists. Non-access is simply a matter of evidence to be considered along with all other evidence in the case relating to paternity.

Advances in the medical sciences have now made the issue of true parentage extremely important. Further, advances in the scientific world have provided evidence from which parentage can be established with much more certainty than at the time of the creation and the application of the common law presumptions.

During times material to the issues under consideration here T.C.A. § 24–7–112 provided as follows:

**24–7–112. Tests to determine parentage—Admissibility in evidence—Costs.**

(a)(1) In the trial of any civil or criminal proceeding in which the question of parentage arises, the court before whom the matter may be brought, upon the motion of either party at the initial appearance, shall order that all necessary parties submit to any tests and comparisons which have been developed and adapted for purposes of establishing or disproving parentage. Tests for determining paternity may include any blood, genetic, or DNA test utilized by an accredited laboratory. Failure to make a timely motion for submission to such tests and comparisons shall constitute a waiver and shall not be grounds for a continuance. The results of such tests and comparisons, including the statistical likelihood of the alleged parent's parentage, if available, may be admitted into evidence as provided in subsection (b).

(2) During any civil proceeding in which the question of parentage arises, upon the motion of either party or on the court's own motion, the court shall, at such time as it deems equitable, order all necessary parties to submit to any tests and comparisons which have been developed and adapted for purposes of establishing or disproving parentage. Tests for determining paternity may include any blood, genetic, or DNA test utilized by an accredited laboratory. Failure of either party to make a motion for submission to such tests and comparisons shall constitute a waiver and shall not be grounds for a continuance. The results of such tests and comparisons, including the statistical likelihood of the alleged parent's parentage, if available, may be admitted into evidence as provided in subsection (b).

(b) Upon receiving the results of the tests and comparisons conducted pursuant to subsection (a), the court shall proceed as follows:

(1) If the results of the tests and comparisons exclude the defendant as the father of the child, this evidence shall be conclusive evidence of non-paternity and the court shall dismiss the proceeding.

(2) If the tests and comparisons do not exclude the defendant as the father of the child, the court upon motion for the intro-

duction of the results of such tests and comparisons by either party, shall determine whether such results may be admitted into evidence. In making such a determination, the court shall consider the probative value of such tests and comparisons and the results thereof and whether or not they have been properly authenticated. If the court determines that the tests and comparisons should be admitted into evidence, such evidence shall be considered by the trier of fact along with all other evidence of the defendant's paternity.

* * * * * *

The above section of the code was amended effective July 1, 1994, to provide a conclusive presumption of paternity if blood, genetic, or DNA testing shows that the statistical probability of paternity is 99 percent or greater. A rebuttable presumption of paternity was created where the statistical probability was 95 percent or greater.[2] It is interesting to note that neither the original statute nor the statute as amended contains a requirement wherein clear, cogent and convincing evidence of non-access is required.

The appellant relies on the case of *Tindle v. Gay*, 891 S.W.2d 617 (Tenn.App.1994) as authority that the presumption of legitimacy of a child born during marriage is conclusive where the proof is clear and convincing that the mother and her husband continued to have sexual relations during the period in which the child must have been conceived. The appellant misapprehends the holding in *Tindle*. The language relied upon by the appellant is simply a recitation of an issue presented to the court by the appellant in *Tindle* and is in no way sustained in the judgment of the court. On the contrary, the court acknowledged the presumption of legitimacy but found that the defendant and not the plaintiff's husband was the child's father. In so doing, the court determined that the testimony of the wife that she was having sexual relations only with the defendant on the date of conception (limited to one date), coupled with the genetic testing evidence was

sufficient to rebut the presumption of legitimacy.

■ We are of the opinion that it is no longer necessary to establish non-access by clear, cogent and convincing evidence to successfully pursue a paternity action against a third party to a marriage. Insofar as this issue, standing alone, is concerned, the jury was properly instructed, accredited the evidence tending to show paternity, and found the defendant to be the father of the child in question. We find no merit in this issue.

Appellant's next issue challenges the jurisdiction of the courts to entertain an action to establish paternity of a legitimate child in one other than the legitimate father of the child. In *Bass v. Norman*, an unreported opinion of this court, opinion filed December 29, 1989, 1989 WL 157884, the court citing *Frazier v. McFerren*, 55 Tenn.App. 431, 402 S.W.2d 467 (1964) stated:

> There is an apparent inconsistency between [§§ 36–2–101 and 36–2–106]. Section [§ 36–2–101] defines a child contemplated by the statute as being born out of wedlock. However, Section [§ 36–2–106] expressly provides that both the mother and her husband may testify as to nonaccess of the husband. This indicates clearly that the Legislature intended to provide for the support of all children proven to be illegitimate both those born out of wedlock and those born to a mother who was married but whose husband was proven not to be the father of the child in question.

■ In *Frazier*, a paternity action was successfully prosecuted by the mother against the child's father, even though the mother was married to another at the time of the child's birth. "*Frazier* holds that, under the statutes considered, a proven father owes a duty of support to his child regardless of whether he was married to the mother or whether the mother was married to another man at the time of birth. Because of the peculiar provisions of T.C.A. § 36–2–106, the court concluded that the Legislature intended that illegitimate children, even those legally presumed to be legitimate, but actually

**2.** Interestingly, this case was tried on June 30, 1994 and July 1, 1994. The conclusive presumption created by the 1994 amendment to T.C.A. § 24–7–112 was effective July 1, 1994.

shown not to be the children of the husband, were owed a duty of support by the biological father. The purpose of the paternity statute is to require a biological father to support his child." *Bass, supra.* Under the authority of *Bass* and T.C.A. § 36–2–106 coupled with the provisions of T.C.A. 24–7–112, we believe that all common law presumptions relating to paternity and legitimacy are rebuttable and the public policy has now been established by the General Assembly that true parentage is the end that should be pursued by the courts in paternity actions. The courts in this jurisdiction obviously possess jurisdiction to try these types of cases. We find no merit in this issue.

The third issue challenges the propriety of the trial court in allowing the plaintiff to relitigate paternity of the child since the child was impliedly, at least, found to be the legitimate child of the husband in the divorce action between Shell and Edmondson. To sustain this issue, the appellant relies upon the doctrines of *res judicata* and estoppel.

We are of the opinion that *White v. White,* 876 S.W.2d 837 (Tenn.1994), is controlling. As to *res judicata,* in *White* it is said:

> In order to be successful, a party asserting a *res judicata* defense must demonstrate: (1) that the underlying judgment was rendered by a court of competent jurisdiction; (2) *that the same parties were involved in both suits;* (3) that the same cause of action was involved in both suits; and (4) that the underlying judgment was on the merits. (Emphasis added).

■ As to the theory of *res judicata,* clearly the requirement necessary to bring the doctrine into play are not established. Simply stated, the *res judicata* defense is defeated in this action because the parties are not the same.

■ The question regarding estoppel requires a more careful examination. The doctrine of judicial estoppel is generally stated as follows:

> The doctrine of judicial estoppel provides a litigant who has deliberately taken a position in one judicial proceeding will not, as a matter of law, be allowed to advantage his or herself by taking an in-

consistent position in another suit. *In Melton v. Anderson,* 32 Tenn.App. 335, 222 S.W.2d 666 (Tenn.App.1948) this court said, at 669:

> A general statement of the doctrine of judicial estoppel is that where one states on oath in former litigation, either in a pleading or in a deposition or on oral testimony, a given fact as true, he will not be permitted to deny that fact in subsequent litigation, although the parties may not be the same. (Citations omitted.)

*Extine v. TRW Koyo Steering Systems Co,* 1994 WL 589557 Unpublished opinion Tenn. App.1994.

■ In *Carvell v. Bottoms,* 900 S.W.2d 23 (Tenn.1995), the Supreme Court in discussing judicial estoppel noted that the policy undergirding judicial estoppel is to prevent a party from gaining an unfair advantage by taking inconsistent positions on the same issue in different lawsuits. We believe that the reasoning stated in *Carvell,* i.e., where an attempt to gain unfair advantage is absent, judicial estoppel does not apply, is applicable to the facts of this case. At the time of the divorce hearing, the parties were unaware of the true facts relating to paternity of the child in that DNA tests had not, at that time been performed. It therefore follows that there was and is no attempt to take unfair advantage by taking inconsistent positions, but to the contrary, disallowing the application of judicial estoppel rectifies an unfair result created by the prior litigation. We find the doctrine of estoppel to be inapplicable under the circumstances of this case.

Appellant's next two issues charge the trial court with error in allowing evidence of DNA testing. The chief complaint is that the expert witness failed to establish a proper chain of custody of the blood samples tested. The appellant further complains that the requirements of T.C.A. § 24–7–112 were not met in that the procurement of the evidence was not judicially supervised.

We will first look to the chain of evidence question. In *Ritter v. State,* 3 Tenn.Crim. App. 372, 462 S.W.2d 247 (1970), we find the following discussion:

The chain of evidence method of identification is a widely recognized concept in both civil and criminal law. In most cases it is not possible to establish the identity of an exhibit in question by a single witness. Several persons have usually handled the specimen before its analysis. See Annotation: 21 A.L.R.2d 1216; 29 Am.Jur.2d Evidence Sec. 830; 32 C.J.S. Evidence § 588(2).

Blood specimens such as this should be handled with the greatest of care and all persons who handle the specimen should be ready to identify it and testify to its custody and unchanged condition. *People v. Sansalone*, 208 Misc. 491, 146 N.Y.S.2d 359 (1955).

Whether the requisite chain of possession has been sufficiently established to justify admission of the exhibit, is a matter committed to the discretion of the trial judge and his determination will not be overturned in the absence of a clearly mistaken exercise thereof. *State v. Brown*, 99 N.J.Super. 22, 238 A.2d 482 (1968).

*In Patterson v. State*, 224 Ga. 197, 160 S.E.2d 815 (1968), a medical technologist took a blood specimen and placed the sample in four tubes, personally labeled them and put them in a refrigerator in the laboratory, Friday, June 9, 1967. The following Monday, June 12, 1967, the chief technologist ran a test. From Friday until Monday, approximately eight persons employed in the laboratory had access to the refrigerator. The court said:

"The evidence shows that the blood sample was handled in the normal course of testing and there is nothing in the record that creates a suspicion that the blood tested was other than that taken from the defendant. The identity of such blood samples need not be proved beyond all possibility of doubt or that all possibility of tampering with them be excluded. The circumstances need only establish reasonable assurance of the identity of the sample."

· We believe the evidence relating to blood testing in this case is analogous to the facts as stated in the above case. Here, the blood was drawn by a phlebotomist and not by the witness testifying. The witness, Dr. Hubbard, testified as follows:

Q. Do your records reflect the dates upon which those tests (DNA) were conducted, and in whose presence they may have been conducted, and under what types of conditions and policy?

A. Which would you like for me to answer first? I can explain to you the normal operating procedure. The blood is drawn in the hospital laboratory, not by me, it's drawn by a phlebotomist, who are people who are specifically trained to draw blood. After the blood is drawn, there are various documents that have to be signed to maintain chain of possession of the blood. An authorization to do the testing is given by individuals involved in the case. Their phlebotomy or the blood being drawn is witnessed, and the witnesses sign as to who they are. Individuals participating in the case are photographed, identified using a picture ID usually, or mutual identification. They are fingerprinted and they are photographed. Once the blood is drawn, the participants, if they are able, initial the blood tubes, if they are able. I mean if it's a minor, then one of the guardians initial the blood tubes. Then they are sealed in a sample—in a tamper evident sample package, it's not tamper proof. And once the blood samples are sealed in that tamper evident bag, along with the documentation, then participants in the test initial the seal, and then they are taken to my laboratory, and then I, or one of my technologists, opens the bag and the tests will proceed from there.

 There is further evidence that the Dr. Hubbard personally did the testing on the blood samples in question. Dr. Hubbard also produced the record containing the documentation testified to above. There is nothing in the record to cast suspicion on the authenticity of the samples. In keeping with *Ritter v. State*, supra, we are of the opinion that the failure to have the phlebotomist available to testify did not render the evidence incompe-

tent. Rather, the circumstances under which the samples were taken and the tests conducted, are matters affecting the credibility of the evidence rather than the admissibility. Credibility of evidence is within the jury's province.

As to the contention that the requirements of T.C.A. § 24–7–112 were not met, we find no error on the part of the trial judge in admitting the evidence. The parties voluntarily submitted to the blood testing without judicial intervention and will not now be heard to complain as to the lack of judicial supervision. We hold that by voluntarily undergoing the blood tests the parties waived the formal requirements of T.C.A. § 24–7–112.

We find no merit in these issues.

The next issue relates to the doctrine of laches. Laches is established when there has been "neglect or omission to assert a right which, taken in conjunction with a lapse of time, causes prejudice to the adverse party." *First American Bank of Nashville v. Woods*, 734 S.W.2d 622 (Tenn.App.1987), perm. app. denied, (1987). Courts are reluctant to apply the defense of laches and in a case where delay in filing suit can reasonably be explained or justified, the defense will not be applied. *Freeman v. Martin Robowash, Inc.*, 61 Tenn.App. 677, 457 S.W.2d 606 (Tenn.App.1970). The record does not establish any prejudice by the timing of this action. Hence, we find the doctrine of laches to be inapplicable.

The next assertion which the appellant insists requires reversal of the trial court's judgment is that the "legitimate father of the child was an indispensable party to this paternity suit." We respectfully disagree. At the time of this trial, the parental rights of the husband had been terminated.[3] He had no other nor further interest in the outcome of this case.

Under Rule 19.01, Tennessee Rules of Civil Procedure, a person must be made a party if in his absence complete relief cannot be accorded among those already parties or an

interest relating to the subject matter of the action is asserted and he is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reasons of his claimed interest. We are of the opinion that the above requirements for an indispensable party have not been demonstrated. We find no merit in this issue.

The next issue attacks the court's action in restricting testimony regarding laches and in the court's instructions to the jury relating to laches. Laches is a purely equitable doctrine and is for the court to determine rather than the jury. "... cases of such complicated and intricate nature involving mixed questions of law and fact not suitable for solution by a jury such as laches or estoppel" are not jury questions. *See State v. Hartley*, 790 S.W.2d 276 (Tenn.1990).

In this case, the issue of laches was submitted to the jury. The jury obviously rejected the defense of laches and the trial judge in weighing the evidence on motion for new trial obviously agreed that the doctrine of laches did not apply. Hence, any error in submitting laches to the jury was harmless.

Appellant's last issue relates to the sufficiency of the evidence. Our review of the record reflects that there is ample evidence to establish clearly, cogently and convincingly that the defendant is the biological father of the child in question. We find no merit in this issue.

### CONCLUSION

The judgment of the trial court if affirmed in all respects. Costs are taxed to the appellant and this case is remanded to the trial court for the collection thereof.

FRANKS and SUSANO, JJ., concur.

---

3. Our resolution of this case in no way is intended to affect the rights of the child in question,

either on the termination question or the paternity issue. The child is not a party to this action.