IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 20, 2017

## STATE OF TENNESSEE v. MILLARD ELLIS SPURGEON

**Appeal from the Circuit Court for Sevier County**
**No. CR19269-II     Richard R. Vance, Judge**

---

### No. E2016-02210-CCA-R3-CD

---

The defendant, Millard Ellis Spurgeon, appeals his Sevier County Circuit Court jury convictions of burglary, theft of property valued at $1,000 or more, vandalism of property valued at $1,000 or more, and possession of burglary tools, challenging the trial court's denial of his motion to suppress certain evidence and the sufficiency of the convicting evidence.  Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Garry Lee Chin, Knoxville, Tennessee (on appeal); and William L. Wheatley, Sevierville, Tennessee (at trial), for the appellant, Millard Ellis Spurgeon.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Jimmy B. Dunn, District Attorney General; and George Ioannides, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Sevier County Grand Jury charged the defendant and David Way via presentment with one count each of burglary, theft of property valued at $1,000 or more, vandalism of property valued at $1,000 or more, and possession of burglary tools for his role in the August 19, 2012 break-in at Gatlinburg-Pittman High School.

At the December 16, 2015 joint trial, Gatlinburg-Pittman High School principal Tony Ogle testified that at approximately 5:00 a.m. on Sunday August 19, 2012, the school's security monitoring firm notified him by telephone that an alarm had been triggered at the school.  Mr. Ogle confirmed that he wanted the police dispatched to the

school, and he dressed quickly and drove to the school. When he arrived, a number of officers from the Gatlinburg Police Department ("GPD") were present. Mr. Ogle entered the school with officers and reviewed the video footage from the school's security cameras. On the video, Mr. Ogle observed two perpetrators use various tools to break into the ATM, soft drink vending machines, and a change machine. The perpetrators wore dark or camouflage clothing, hoods, masks, and gloves. The shorter of the two perpetrators had a very distinctive gait. Mr. Ogle explained that the individual "display[ed] a kick of his heels where he raises the heel up to touch the back of his leg or his thigh." The perpetrators used pry bars, pliers, a tool with a forked end, and a chisel to break open the ATM. After opening the ATM, the individuals pried open the "cash cassette" or money box and pocketed its contents. They then cleaned up the area, and the taller of the two used a spray bottle to clean the floor. Mr. Ogle said that the perpetrators entered through a window in the teacher's lounge.

Mr. Ogle said that he did not recall any officer's having collected any evidence from the school on August 19 but that the school was locked after he and the officers left the school. On the following day, a Monday, school was in session. Mr. Ogle said that he and a school janitor cleaned up debris from the floor before students arrived and made efforts to cordon off the ATM until the police could collect it.

GPD Detective Gary McCarter responded to the high school on August 19. He reviewed the video surveillance with Mr. Ogle and observed damage to the ATM, vending machines, and change machine. He did not collect any evidence from the school that day and took no steps to preserve the scene because "[t]he school was secured. It was locked down that day because there were no kids there, so it was locked up." After leaving the school that morning, Detective McCarter went to McKinney's Market, where he told clerk Jamilla Byrd about the burglary and asked her to be on the lookout for the perpetrators. He described the clothing they wore in the video surveillance and demonstrated the peculiar gait of the shorter perpetrator. A few hours later, Ms. Byrd telephoned and told him that a man displaying such a gait had entered the market. Detective McCarter dispatched uniformed patrol officers to the market and then drove there himself.

When Detective McCarter arrived at McKinney's Market, he found the defendant and Mr. Way being questioned by the uniformed patrol officers. After being provided with Miranda warnings, Mr. Way consented to a search of the van in which the men had been traveling. Inside the van, Detective McCarter found "a box of tools" and wet clothing that was "very similar to" the clothing worn by the perpetrators in the surveillance video, including "several pair" of gloves that were "similar to the ones that you'll see in the video. They have the white writing on them." Detective McCarter recognized among the tools he collected a "pry bar" that was the same type of tool carried

by the perpetrators in the surveillance video. Detective McCarter also recognized a chisel and a "bearing puller" "that appear[ed] to be similar" to the one used to open the ATM machine. He acknowledged that he did not find masks, backpacks, or large sums of money inside the vehicle.

Both men provided written statements detailing their whereabouts for the previous evening. The defendants told Detective McCarter that "[t]hey had been home and they were taking that vehicle to work on somebody's car or they had been working it, taking it back, something like that." Detective McCarter took the items he collected to the Gatlinburg Police Department, photographed them, and put them into his office. He did not wear gloves when collecting the tools and did not individually tag them at that time. He then telephoned Mr. Way's mother, who told the detective that Mr. Way had been home all night. When he finished, Detective McCarter left to go out of town, and Detective Rodney Burns took over the investigation.

Jamilla Byrd testified that Detective McCarter, who was a regular customer at McKinney's Market, came in on the morning of August 19, 2012, and told her about the burglary at the high school. She said he described the perpetrators to her: "The first one he said was kind of tall and had a lazy eye, and he said the second one had a very distinct characteristic. He was short and then he did a leg kick behind him." At approximately 11:00 a.m. that same morning, "a gentleman came in and wanted to get lottery tickets." She said that the man, whom she identified as Mr. Way, spent "roughly about two or three hundred dollars" buying lottery tickets and that he remained inside the store for 10 to 15 minutes while buying and cashing in his various tickets. While Mr. Way was in the market, another man came in with lottery tickets, and Ms. Byrd observed the man, whom she identified as the defendant, "standing at the counter kicking his legs back like" Detective McCarter had demonstrated.

Detective Burns testified that on August 20, 2012, "[t]he chief told [him] to go ahead and begin to start investigating it because Detective McCarter had started vacation." Detective Burns began his investigation with a trip to the high school, where he photographed the damaged ATM machine and vending machines. Detective Burns also "collected some chippings of the metal on the floor, some pieces of the paint" from the area around the ATM and "a little bit of dirt off the window sill" of the "window in the rear of the school" that was the apparent entry point used by the perpetrators. After photographing the machines and collecting the other evidence, Detective Burns "unbolted the ATM from the floor" using a wrench that he borrowed from someone on the maintenance crew at the school and then asked some "school maintenance workers for the county" to "cut the pieces [he] wanted cut off" of the ATM using a blow torch.

Detective Burns gathered all of the items into his vehicle and transported them to the police station, where he "wrapped up the pieces of the ATM" with thick, brown paper "and taped them, secured them and" placed them in his office. Later that day, he interviewed the defendant, who told him that he had spent the previous evening at his aunt's house on Chelan Drive. When the detective asked about the clothing and tools discovered inside the van, the defendant said "something along the fact, you mean you're going to charge me with this based on that?" In a separate interview, Mr. Way told Detective Burns that he worked as a mechanic and sometimes borrowed his mother's van to go to various jobs but "that he was basically having it rough financially at that time, that he didn't have any money and that he was on food stamps." Mr. Way claimed ownership of the clothing and tools discovered inside his mother's van and explained that the clothing in the van had become wet because it had been laying out on the ground all night. Mr. Way said "that he had loaded" the tools and clothing into the van that morning "to take with him" to work.

On the following day, Detective Burns returned to the police department and retrieved the tools from Detective McCarter's office. Wearing gloves, Detective Burns wrapped the tools individually in thick, brown paper and presented them to the evidence clerk to be placed into the evidence locker at the police department. He also placed the wrapped portions of the ATM into the evidence locker. Detective Burns transported the ATM pieces, tools, clothing, and other items to the Tennessee Bureau of Investigation ("TBI") on October 24, 2012. He took "a drink bottle and some swabs" to the Knoxville TBI office and the remaining items to the Nashville TBI office, explaining, "Knoxville does DNA testing, but Knoxville does not do ballistic testing or tool mark testing." After he retrieved the items from the TBI, he took them back to the evidence locker.

Detective Burns testified that he did not attempt to obtain fingerprints from the ATM, vending machines, or tools because the video surveillance clearly showed the perpetrators wearing gloves. He acknowledged having wiped some of the smaller tools "that were down inside the toolbox . . . because . . . they had the power steering fluid and all that on them."

TBI Special Agent and Forensic Scientist Randall Nelson collected paint scrapings from several tools and "did an analysis to compare the paint" collected from the tools "to the paint on the ATM pieces." Ultimately, Agent Randall determined that the paint collected from two pry bars "could not have come from the ATM" but that paint collected from a chisel and a "forked tool" "was consistent with the paint from the ATM with respect to color, type, texture, binder composition and pigment composition." He concluded that "the paint scrapings" on the chisel and the forked tool "could have come

-4-

from the ATM represented by Exhibits 3A and 4A, or another object with the same paint history."

TBI Special Agent and Forensic Scientist Teri Arney performed tool mark examinations on the tools and ATM after Agent Randall finished his analysis. Agent Arney used a silicone casting medium to preserve the microscopic characteristics of each individual tool and created "test tool marks" by striking the tool on a sheet of lead. She found usable tool marks "on the door of this ATM" and matched three of the tool marks to the forked tool.

Tennessee State Bank electronic banking manager Stephanie Randles testified that she was responsible for the management of offsite ATMs, including the one at Gatlinburg-Pittman High School. Ms. Randles said that the ATM was damaged beyond repair, and "a new one had to be purchased, and the total for that was" $3,600. At the time of the burglary, the ATM contained $1,540.

Based upon this evidence,[1] the jury convicted the defendant and Mr. Way as charged. Following a sentencing hearing, the trial court imposed Range II sentences of eight years for each of the defendant's felony convictions and a sentence of 11 months and 29 days for the defendant's misdemeanor conviction of possession of burglary tools. The trial court ordered the defendant to serve the eight-year sentence imposed for the theft conviction to be served consecutively to the eight-year sentence imposed for the conviction of burglary and the remainder of the sentences to be served concurrently for a total effective sentence of 16 years' incarceration.

Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by denying his motion to suppress the evidence collected from the high school and from Mr. Way's van, claiming that the State failed to establish a sufficient chain of custody for the evidence. The defendant also challenges the sufficiency of the convicting evidence.

## I. Chain of Custody

Prior to trial, both the defendant and Mr. Way moved the trial court to exclude the tools and clothing seized from Mr. Way's van by Detective McCarter as well as the ATM pieces seized from the school by Detective Burns. They claimed that the failure of the GPD detectives to properly log the items into evidence at the time of their

---

[1] The defendant presented proof in the form of the preliminary hearing testimony of his aunt, Vicki Dunn, who had passed away by the time of the trial. The transcript of Ms. Dunn's testimony was read to the jury but was not transcribed, entered into evidence, or made a part of the record on appeal.

collection and the delay surrounding the items' delivery to and retrieval from the TBI created a break in the chain of custody sufficient to warrant their suppression.

At the hearing on the suppression motion, Detective McCarter testified as he did at trial that he responded to the call of a burglary at the high school. He observed the damaged ATM and vending machines but did not collect any evidence from the school at that time. Because it was a Sunday, the school was locked after he left and remained so until the following morning. After leaving the school, Detective McCarter went to McKinney's Market, where he informed Ms. Byrd about the burglary and described the perpetrators to her. She telephoned him a couple of hours later to tell him that men matching the description were at the market. The men, the defendant and Mr. Way, were detained by GPD officers until Detective McCarter arrived. Mr. Way gave Detective McCarter consent to search his van, and inside the detective discovered a tool box and clothing that matched that worn by the perpetrators as captured on the surveillance video. Detective McCarter transported the items to the police department, where he photographed them. He then locked the items in his office and left for a week's vacation.

Detective Burns testified that he was assigned to take over the investigation. Detective Burns collected pieces of the ATM, paint chips and other debris, and dirt from the high school. He wrapped the pieces of the ATM in thick, brown paper and took them to the police station, where he locked them inside his office while he went to interview the defendant and Mr. Way. On the following day, a Tuesday, Detective Burns went into Detective McCarter's office using a key that had been provided to him by the chief of police and individually wrapped the tools and clothing in brown paper. He then took the tools, clothing, pieces of the ATM, and other items to the evidence clerk so that they could be locked in the evidence locker. A little over two months later, Detective Burns took the items to the TBI for forensic examination. He later retrieved the items from the TBI and transported them back to the police department, where they remained locked in the evidence locker until defense counsel asked to see them prior to trial. Detective Burns testified that when the items were removed for defense counsel's examination, all the items were "[i]n the same condition" as when he had "received them from the crime lab."

At the conclusion of the hearing, the trial court denied the defendants' motion:

> The argument by the defense counsel centers primarily upon inconsistencies between the taped conversation and the testimony by Detective McCarter and inconsistencies, apparently, of some dates on evidence logs. But the facts are

-6-

that Detective McCarter seized the evidence, locked it in his office where it remained locked until Detective Burns got the key to the door from his chief, took the items, eventually took them to the crime lab, recovered them, and has testified that they were the same. There has been no showing that these items were tampered with, falsified in any way. . . . He had the tools. Detective Burns got the tools. There's no break in the chain. They went from Detective McCarter to Detective Burns by way of a locked office that was provided by the chief of the department. So the motion to suppress is denied.

In this appeal, the defendant reiterates his claim that the State failed to establish a chain of custody sufficient to warrant admission of the evidence. The State asserts that there was no break in the chain of custody.

"Whether the requisite chain of custody has been established to justify admission . . . is 'a matter committed to the discretion of the trial judge and [t]his determination will not be overturned in the absence of a clearly mistaken exercise thereof.'" *Davis v. Shelby County Sheriff's Dep't*, 278 S.W.3d 256, 267 (Tenn. 2009) (quoting *Shell v. Law*, 935 S.W.2d 402, 409 (Tenn. Ct. App. 1996)). Accordingly, this court will not reverse the trial court's ruling on the chain of custody "unless the trial court 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *State v. Cannon*, 254 S.W.3d 287, 295 (Tenn. 2008) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

Although "it is 'well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody,'" *Cannon*, 254 S.W.3d at 296 (quoting *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000)), the general rule "does not require that the identity of tangible evidence be proven beyond all possibility of doubt," *Cannon*, 254 S.W.3d at 296. The State need not "call all of the witnesses who handled the item." *Id.* (citing *State v. Johnson*, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984)). So long as the State can "reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id.*

In this case, the State established that Detective McCarter collected the clothing and tools from Mr. Way's van and then transported them to the police department, where he photographed the items before locking them in his office. Detective Burns entered Detective McCarter's office using a key provided by the police chief, individually wrapped the items in brown paper, and then presented them to the

evidence clerk to be placed into the evidence locker. Detective Burns also collected pieces of the ATM from the high school, wrapped them in brown paper, and locked them in his own office while he interviewed the defendants. The next day, he presented the wrapped pieces to the evidence clerk. All the tangible items remained locked in the evidence locker until Detective McCarter transported them to the TBI for examination. After the TBI completed its examination, Detective McCarter retrieved the items and returned them to the police department, where they were locked in the evidence locker. There they remained until they were retrieved for examination by defense counsel. No evidence suggested that any of the items had ever been improperly opened or tampered with in any way. Thus, because the evidence presented sufficiently established the chain of custody for all of the items, the trial court did not abuse its discretion by refusing to exclude the evidence.

## II. Sufficiency

The defendant challenges the sufficiency of the convicting evidence, arguing that the proof adduced by the State was insufficient to establish his identity as the perpetrator. The State contends that the evidence was sufficient.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Here, video surveillance from Gatlinburg-Pittman High School showed two individuals, who had gained unauthorized entry to the school, using a variety of tools to break into an ATM, some vending machines, and a change machine. Although the individuals wore gloves and masks, one of the perpetrators displayed a very distinctive

gait. After being provided a description of the individuals that included a demonstration of the odd gait, Ms. Byrd observed the defendant display the same distinctive gait inside McKinney's Market. The defendant was with Mr. Way, who, despite what he described as a difficult financial position, spent some $300 on lottery tickets. Mr. Way gave officers consent to search his van, and inside the van, officers found a tool box full of tools and clothing that appeared to be the same or similar to the clothing worn by the individuals captured in the surveillance video. TBI examination of tool marks on the door of the ATM and paint chips on the forked tool and chisel seized from Mr. Way's van established that the marks on the ATM were made by those tools. Although circumstantial in nature, this evidence, considered in the light most favorable to the State, was sufficient to establish the defendant's identity as one of the perpetrators.

*Conclusion*

Based on the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE