FILED
09/28/2018
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 7, 2018

## STATE OF TENNESSEE v. TONY GIBSON

**Appeal from the Criminal Court for Shelby County**
**No. 15-06411    James M. Lammey, Judge**

_____

### No. W2017-01235-CCA-R3-CD

_____

The defendant, Tony Gibson, appeals his Shelby County Criminal Court jury convictions of tampering with evidence, claiming that the trial court erred by admitting certain evidence. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and ROBERT L. HOLLOWAY, JR., JJ., joined.

Genna M. Lutz, Memphis, Tennessee, for the appellant, Tony Gibson.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Tyler Parks and Ryan Thompson, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

In December 2015, the Shelby County Grand Jury charged the defendant with one count of possession with intent to sell 26 grams or more of cocaine within 1,000 feet of a school, one count of possession with intent to deliver 26 grams or more of cocaine within 1,000 feet of a school, two counts of tampering with evidence, and one count of possession of dihydrocodeionone. At the defendant's January 2017 trial, the State dismissed the fifth count of possession of dihydrocodeionone. A jury found the defendant not guilty of the drug possession charges and guilty of the two tampering with evidence charges.

At trial, the defendant moved to exclude all evidence tagged by former Memphis Police Department ("MPD") Officer Brett Murphy because the State did not intend to call Murphy as a witness. The defendant argued that the State could not prove

that the evidence tagged by Officer Murphy had not been "tampered with, lost, or damaged in some way." The State argued that other MPD officers who participated in the defendant's arrest and collection of the evidence would testify to Officer Murphy's actions. The trial court ruled that "gaps in the chain of custody can be cleared up by testimony" and that if there are such gaps, "it seems like that would go to the weight of the evidence, not the admissibility." The court concluded that it would "see if [the State] lay[s] the foundation to where the [c]ourt's satisfied."

MPD Officer Jerry Graves testified that on September 15, 2012, while surveilling the area of the Union Express hotel, his partner, Officer Jonathan Gross, radioed him about "two suspicious male blacks leaving the hotel room in a black Dodge Charger with Texas tags." Officer Graves saw the vehicle, "pulled up next to them at the red light" in his marked squad car, and observed that neither man in the vehicle was wearing a seat belt. Officer Gross then initiated a traffic stop by "[a]ctivat[ing] his blue lights." The driver of the vehicle, later identified as the defendant, stopped the car. Officer Graves approached the driver's side of the vehicle, while Officer Gross approached the passenger's side. Officer Graves testified that, as he approached, he observed the defendant "shoving a clear bag with some white powder residue in it inside [a] Coke can, the lid of the spout." The can was in the center console and was not cut open when Officer Graves first saw it in the vehicle; rather, "[j]ust the little drinking hole was open." By this point, Officers Brett Murphy and Fred Blank had arrived to assist with the traffic stop. The defendant and the passenger, later identified as Carl Knox, complied with the officers' request to exit the vehicle.

Officer Graves testified that he observed Officer Murphy go "inside the car and retrieve[] the Coke can" but that he did not see Officer Murphy do anything with the can. He could only see that Officer Murphy "was standing over there next to Officer Gross and [Mr. Knox]." Officer Murphy then told the other officers that "we need to put these guys in the back seat, put them in the squad car." Officer Graves testified that, after the officers had placed the defendant and Mr. Knox into separate squad cars, "Officer Murphy showed [him] the can and he had cut it open with his knife and poured the Coke out on the curb." Officer Graves testified that he observed "two bags of white powder in the bottom of the Coke can." He also observed a "white powder residue" on the lid of the can "where the driver was shoving it and . . . the lid cut one of the bags open."

Officer Graves testified that he noticed a "kind of scuffle between Officer Gross and [Mr. Knox]." The other officers handcuffed Mr. Knox, and Officer Graves "realized that they had found cocaine on [him]." Officer Graves testified that he found a room key during a search of the defendant and that he "notified some detectives [he] work[s] Narcotics with" to assist in the investigation. Another officer obtained a search

-2-

warrant for the defendant's hotel room. Officer Graves testified that he participated in the search of the hotel room and that he found a "brown paper sack" with "five clear plastic bags of white powdery substance that [he] believed to be cocaine" inside a slit cut in a mattress. After finding the bags of white powder in the mattress, Officer Graves searched the defendant again and found "about a thousand dollars" in cash "inside of [the defendant's] sock, but it was laid out flat and he had it on the bottom laid long way, the length of his foot, and he had his sock back on it." Officer Graves testified that based on his "training and experience, a lot of these guys like to hide money and drugs, things like that, down inside of their shoes or in their socks."

Officer Graves identified a photograph of the Coke can with two bags in it, the room key found on the defendant, the five bags of white powder found in the mattress, the Coke can retrieved from the defendant's car, a photograph of the brown paper sack and the bags of powder found in the mattress, and a photograph of the room number of the hotel room that he searched. He testified that each item appeared to be in the same condition as the night of the defendant's arrest.

On cross-examination, Officer Graves testified that in identifying the items admitted into evidence, he assumed the items had "been in the property and evidence room." He stated that he was certain the five bags of white powder that he identified in court were the same ones collected at the scene because he was "the one that cut the bag open before the jury came in and pulled it out." He also stated that he had seen thousands of bags of cocaine in his career and that these particular bags were distinctive because there were five of them and "to get five bags that size, that's always going to stand out." Officer Graves testified that he did not see the officers remove the bags of white powder from Mr. Knox, but he saw the bags after the officers had retrieved them.

Tekisha Barrett Scruggs testified that, in her position as a detective with the MPD, she would deliver evidence to the Tennessee Bureau of Investigation ("TBI") from the property and evidence room. Upon a request to transport such evidence, she would

> check out the evidence from the property and evidence room . . . , compare it to what was tagged into evidence during the arrest, . . . cut open the envelopes, verify that what's on the evidence ticket is what is inside the envelope, look at the package, write a brief description of it, . . . seal it back up, put [her] initials on it[,] and transport it to TBI, and turn it in to them.

Detective Scruggs identified an evidence envelope by her initials on it and testified that she transported this envelope by the procedure described above. This envelope was later shown to contain the two bags of white powder retrieved from Mr. Knox and the two bags of residue found inside the Coke can.

On cross-examination, Detective Scruggs explained that to determine if evidence had been tampered with, she would receive a sealed item from the property and evidence room and verify that the contents matched the weight, description, and type of drug listed on the evidence form. Detective Scruggs testified that the item would also contain the initials of the person who transported it from the scene and the person who accepted the evidence at the property and evidence room. Detective Scruggs testified that the evidence envelope that she identified on direct-examination "was brought from the field by Officer Murphy" and "Cordell Hicks was the person in the property room that received it at the time of the arrest."

TBI Special Agent and Forensic Scientist Peter Hall testified that he "test[ed] evidence for the presence of controlled substances." He testified that when a police agency brought a piece of evidence to the TBI lab for testing, a forensic technician would receive that evidence and "fill out some paper work and start[] the chain of custody on that particular case." The forensic technician would prepare a folder for the case and give the folder to Special Agent Hall. When Special Agent Hall was ready to work on a specific case, the forensic technician would "receive the associated evidence from the evidence vault and then give it to [him]." Upon receiving the evidence, Special Agent Hall would "take all the contents out[,] take an inventory of everything, . . . separate out the exhibits or the individual items in there[,] and then . . . obtain what's called a net weight." He explained that "[a] net weight is just the weight of the substance without any sort of packaging whatsoever." After obtaining the net weight, Special Agent Hall would then test the substance.

Special Agent Hall received certain evidence from this case at the TBI lab for testing. He identified an envelope by his "handwriting, . . . the TBI lab case number and subject's name, the date it was submitted, [his] initials, the person who submitted it. . . , [the] TBI crime lab tape, [his] initials, [and] the date it was sealed." He testified that a white powder from the envelope tested positive for cocaine and weighed 122.65 grams. Special Agent Hall then identified the same evidence envelope identified previously by Detective Scruggs. He testified that a white powder from this envelope "was positive for cocaine and weighed 54.40 grams." In this same envelope, "[t]here was a residue," but "it was degraded or there wasn't enough to test." He said that the residue "appeared to have been wet at some time and then dried." He also said that, although it could have been possible to test the residue, the TBI's policy required him "to try to use less than one

-4-

half of the substance just in case it needs to be retested later." Under this policy, he could not obtain a large enough sample "to do any sort of good testing." Special Agent Hall testified that, in his expert opinion, the white powder substances that he did test were positive for cocaine.

On cross-examination, Special Agent Hall testified that, because he weighed all of the contents of an exhibit "as a whole," he did not know the individual weight of each bag of cocaine. When asked to describe the residue that he was unable to test, Special Agent Hall testified that "[a]ccording to [his] notes, it says appears to have been wet and then dried, contents of clear plastic bags were dissolved, no analysis." He explained that when testing a substance, he does "one screening test" and "two . . . confirmatory tests." He testified that the TBI tests evidence only to determine the presence of a controlled substance and does not conduct testing to determine whether the substances "came from the same batch."

MPD officer Jonathan Gross testified that he was "doing surveillance on" a hotel "known for drug and prostitution related offenses" on September 15, 2012, when he observed the defendant and another man exit a hotel room and get into a black Dodge Charger. He noticed that this was a rental vehicle, "which through [his] experience is known for drug dealers to use the vehicles to transport illegal narcotics." After observing the defendant and the other man get in the vehicle and drive away, Officer Gross radioed his partner and "told him that a black Charger occupied by two males was driving southbound on Pauline." Officer Gross testified that during the traffic stop he approached the passenger's side of the vehicle and "did not see the driver do anything." He testified that he observed the Coke can in the vehicle "that [his] partner was inquiring about." After his partner asked the driver to exit the vehicle, he asked Mr. Knox to do the same. Mr. Knox was attempting to turn away from Officer Gross and "kept digging into his pockets." While patting down Mr. Knox, Officer Gross found "two bags of white, powdered substance in his left-front pocket."

The State passed to Officer Gross the evidence envelope previously identified by Detective Scruggs and Special Agent Hall. The defendant renewed his objection to the admission of the evidence on the ground that the State had not established a proper chain of custody. The court stated that the evidence was marked only for identification at that point and instructed the State to "[l]ay a foundation."

Officer Gross testified that he opened the evidence envelope in the courtroom half an hour earlier in front of the State and defense counsel. Among the evidence that Officer Gross identified from the envelope were "[t]wo large bags of white, powdery substance" that he recovered from Mr. Knox and a "smaller plastic bag . . .

[with] a brown tint to it now." He testified that, during the defendant's traffic stop, he "observed [his] partner with a Coke can that resembled the one in the cup holder inside the vehicle that had been . . . ripped in half." Officer Gross saw his partner "pour[] the Coca Cola out of the can." He identified the plastic bag from the evidence envelope as being the same one from inside the can. The court permitted the two bags of white powder that Officer Gross recovered from Mr. Knox and the plastic bag from the Coke can to be moved into evidence and published to the jury. Officer Gross then identified an exhibit as a photograph "[o]f the cocaine in the Coke can that was found inside of the vehicle." He testified that the can in the photograph was in the same condition as when he saw Officer Murphy with it. Officer Gross then showed the bags found inside the Coke can to the jury describing them as having "a brown tint."

Officer Gross testified, "After we recovered the cocaine, we detained both Carl Knox and [the defendant]." Officer Gross transported Mr. Knox "back to the hotel and that's when they executed the search warrant." Officer Gross participated in the search of the hotel room only "[v]ery briefly. . . . [T]hree or four minutes tops."

On cross-examination, Officer Gross testified that he did not tag the evidence he recovered from Mr. Knox; rather, he turned the evidence over to Officer Murphy. He stated that Officer Murphy took the evidence and tagged it in the property and evidence room but that he did not accompany Officer Murphy and did not witness Officer Murphy transport the evidence. He further testified that the cocaine that he recovered from Mr. Knox was not distinctly packaged in any way.

MPD officer Michael Jackson testified that he participated in this case during the investigation at the hotel. Officer Jackson testified that upon execution of the search warrant, Detective James made "an entry video" of the hotel room. During the search of the room, Officer Jackson "found a digital scale that was on a dresser . . . inside there." Officer Jackson identified the scale for the jury. He testified that, in his experience, such a scale is used "[t]o weigh narcotics."

On cross-examination, Officer Jackson stated that the purpose of the entry video is "[j]ust to show the state of the room and the property before we got there." He testified that he did not personally tag the scale into the property and evidence room, but that "[w]hoever collected the evidence would have collected the scale."

MPD officer Ian James testified that he "wrote the search warrant" in this case. During execution of the warrant, he "took photos, . . . took the video, and . . . watched people being detained at the time." He testified that he submitted the

photographs and videos "to evidence in the property room." He said that the entry video was not available in this case but that he "can't recall what exactly happened" to it.

The court certified Officer James as an expert in street-level drug trafficking. Officer James testified that the amount of cocaine found in the hotel room was more than is typical for personal use and was "definitely a dealer's amount." He also testified that "[d]rug dealers normally have access to scales . . . . They put [the substance] on the scale to weigh it up." Drug dealers often "have a flunky or a carrier, a mule. . . to take the charge if anything should happen." He also said that drug dealers often "hide currency on their person, in their shoes." Officer James identified a photograph of the cocaine, the scale, and cash recovered during the investigation. He testified that the cocaine in the photograph was "packaged for sale."

On cross-examination, Officer James acknowledged that the search warrant contained a typographical error. The warrant incorrectly stated that Officer Graves smelled cocaine in the vehicle, when it should have said that he smelled marijuana. He testified that the purpose of the entry and exit video is to document and preserve the integrity of the investigation. He reasserted that he did not know "[w]hat happened [to the video] between that time and now."

The State called several other witnesses who testified to issues not relevant to the matter before us now. The defendant moved for a judgment of acquittal arguing that, because "[n]one of the white powdery substance that . . . could be under [the defendant's] control" had been tested for the presence of a controlled substance, "there's no proof that that was even contraband. [The defendant] couldn't have been attempting to destroy or conceal the evidence if it's never been shown to be an illegal substance." The State opposed the motion arguing that sufficient evidence existed for the jury to decide the matter. The State reiterated that the chain of custody issue "goes to the weight of the evidence, not admissibility." The defendant argued that "there is a gaping []hole on the chain of custody" because no witness could testify as to "what happened during [the] critical period of time" from when Officer Murphy transported the evidence from the scene to when he delivered it to the property and evidence room. The court ruled that "there's been ample proof of the chain of custody that has been made" and denied the motion.

The defendant testified that in September of 2012, he was living in Dallas, Texas and came to Memphis for the Cooper-Young Festival. He rented a car for the trip and drove to Memphis with Mr. Knox, with whom he shared the cost of gas and a hotel room. The defendant testified that, at the time of the traffic stop, he was on his way to his sister's house. He "was drinking a Coke," and, during the stop, an officer "reached over

[him], unbuckled [his] seat belt, and told [him] to put the Coke can down." The defendant complied with the officer's instructions. The defendant said that when the officers asked him about the bags of powder found on Mr. Knox, he told them that he did not know what it was. The defendant testified that the officers transported him and Mr. Knox "behind a school and [they] sat there about four hours." The officers told the defendant that "they found some plastic bags inside the Coke can." The defendant said that he did not find out that the bags were alleged to contain cocaine "until the next morning when [he] was in jail." He testified that he had "never seen any of it." The defendant explained that he carried money in his sock because he does not "carry a wallet[,] and I'm in Memphis."

On cross-examination, the defendant explained that he has a wallet, but "leave[s] it in the car." The night of his arrest, the defendant "took 1,000 dollars out and put it in [his] sock." He asserted that he "wasn't hiding or concealing it from anyone. I just had it in my sock." He said that the "scale was never in that room" and that he had "[n]ever seen it." The defendant testified that, during the traffic stop, he did not put a bag in the Coke can and that "[n]o one" put a bag in the can. The defendant said that he did not know to what bags the State was referring because "[he has] been asking to see these bags . . . . [He has] not seen no cocaine, [he has] not seen no little baggies, [he has] not seen any of this stuff. . . . [He has] never seen this." Upon viewing the bags previously identified by Officer Gross as the bags recovered from the can, the defendant asked: "How could I stuff a bag this big down in a Coke can?" The defendant denied that his purpose in being in Memphis was to sell cocaine.

The defendant renewed his motion for judgment of acquittal, arguing that "none of the evidence is properly authenticated, none of the evidence was properly put in the chain of custody. The officer who tagged every single item that was presented at trial never testified, never was available to authenticate or to properly put that into evidence." The defendant further argued that "[t]he only white, powdery substance bag the government alleges [the defendant] possessed was never tested to be cocaine." The State opposed the motion. The court ruled that, after considering the credibility of the witnesses, "it is a valid jury question" and denied the motion.

The jury found the defendant not guilty of the drug possession charges but convicted the defendant of two charges of tampering with evidence. The trial court imposed a sentence of eight years' probation.

The defendant filed a timely motion for new trial raising two issues: (1) that the trial court erred by admitting "the Coca Cola can and 0.66 gram bags of white powdery substance" because the chain of custody had not been properly established; and

(2) that the trial court erred by denying the defendant's motion for judgment of acquittal "because the state did not prove that the 0.66 gram bag contained contraband."

At the May 17, 2017 motion for new trial hearing, the defendant argued that "the Coca-Cola can and the bags of the white powder . . . [were] not properly authenticated under [Tennessee Rules of Evidence] 901 because . . . there were several gaps in the chain of custody." The defendant argued that the State's witnesses testified that they saw Officer Murphy holding the can after "cutting it open with his pocket knife" and that Officer Murphy transported all of the evidence from the scene to the property and evidence room alone. No witness testified to seeing Officer Murphy tag the evidence, and no witness accompanied Officer Murphy in transporting the evidence. The defendant also argued that the State failed to establish the identity and integrity of the evidence because "the facts and circumstances surrounding the collection of all of the evidence shows that there were . . . serious problems."

The State argued that the can and bags admitted into evidence at trial were sufficiently identified by an officer who viewed the items at the scene and that the chain of custody issue "would go to the weight . . . , but it doesn't make it inadmissible."

The court denied the motion, agreeing with the State that the chain of custody issue "goes to the weight of the matter rather than admissibility." The court found that the jury's conclusion that the defendant attempted to destroy evidence was logical based on "the sheer volume of cocaine that was found in the room and the volume of cocaine that was on his friend in the car and the fact that . . . the police officer saw him stuffing something in the can." This timely appeal followed.

On appeal, the defendant argues that the trial court erred by admitting the bags of residue found in the Coke can because the State failed to establish a proper chain of custody. Specifically, the defendant argues that because the State did not call Officer Murphy to testify regarding his tagging and transporting the evidence from the scene to the property and evidence room, the chain of custody was inadequate to ensure the integrity of the evidence.

"Whether the requisite chain of custody has been established to justify admission . . . is 'a matter committed to the discretion of the trial judge and [t]his determination will not be overturned in the absence of a clearly mistaken exercise thereof.'" *Davis v. Shelby County Sheriff's Dep't*, 278 S.W.3d 256, 267 (Tenn. 2009) (quoting *Shell v. Law*, 935 S.W.2d 402, 409 (Tenn. Ct. App. 1996)). Accordingly, this court will not reverse the trial court's ruling on the chain of custody "unless the trial court 'applied an incorrect legal standard, or reached a decision which is against logic or

reasoning that caused an injustice to the party complaining.'" *State v. Cannon*, 254 S.W.3d 287, 295 (Tenn. 2008) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

Although "it is 'well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody,'" *Cannon*, 254 S.W.3d at 296 (quoting *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000)), the general rule "does not require that the identity of tangible evidence be proven beyond all possibility of doubt," *Cannon*, 254 S.W.3d at 296. The State need not "call all of the witnesses who handled the item." *Id.* (citing *State v. Johnson*, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984)). So long as the State can "reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Cannon*, 254 S.W.3d at 296.

Here, Officers Graves and Gross testified that they had seen the bags inside the Coke can on the scene. Officer Graves testified that he saw Officer Murphy retrieve the can from the vehicle and later saw "two bags of white powder in the bottom of the Coke can." Officer Gross testified that the plastic bags admitted into evidence appeared to be the same ones from inside the Coke can that he had viewed on the scene. Officer Gross also testified that Officer Murphy tagged and transported the evidence from the scene. Detective Scruggs testified that when she retrieved the evidence from the property and evidence room, the envelope showed Officer Murphy's initials as the officer who "brought [it] from the field." She also testified that before she transported the evidence to the TBI lab, she verified that the contents of the evidence envelope matched the description on the envelope. Special Agent Hall testified that he received the bags of residue in a sealed evidence envelope at the TBI lab. He identified the evidence envelopes containing the bags of residue admitted at trial as the same ones he received and processed at the TBI lab.

No evidence called into question the identity or integrity of the bags of residue. The State presented evidence that the bags of residue admitted at trial were the same bags recovered from inside the Coke can during the traffic stop. No evidence suggested that the bags had been tampered with in any way. Although Officer Murphy did not testify, the other evidence presented "reasonably establish[ed] the identity and integrity" of the plastic bags of residue. *See Cannon*, 254 S.W.3d at 296. Thus, the trial court did not err by admitting the bags at trial.

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE